*Fairfield,*
June, 1834.

Picket
*v.*
Allen.

------

## THE STATE OF CONNECTICUT *against* THE NORWALK AND DANBURY TURNPIKE COMPANY.

The legislature, in the charter of a turnpike company, empowered the proprietors " to erect and establish a toll-gate on their road, in the most convenient place, to be by them determined." In 1796, about a year after the grant, they erected and established a gate, at a certain place on the *Southerly* portion of their road, that being determined by them to be the most convenient place. It was removed afterwards, from time to time, and place to place, until it was placed, in *November*, 1831, at a certain point on the *Northerly* portion of their road. In *May*, 1832, the legislature incorporated another turnpike company, on the petition of the proprietors, whose road intersected the *Northerly* part of the first-mentioned road, below the last location of the gate. In the charter of this company, it was provided, that the first-mentioned company " should not thereafter maintain a gate on their road *Northerly* of said point of intersection;" but " that they should have the right, at all times, to maintain a gate on their road, at any place *Southerly* of said point of intersection, agreeable to the terms of their original charter." In *November*, 1833, said gate was removed to a point *Southerly* of said point of intersection. On an information in the nature of a *quo warranto*, filed in *December*, 1831, and continued until *December*, 1833, complaining of the location of the gate in *November*, 1831, it was held, 1. that the power of locating the gate, given by the charter, was exhausted, when that power was once exercised, and consequently, the company had no right, by the terms of the charter, to make the location complained of; 2. that the company had not this right by virtue of the repeated removals, which had taken place between 1796 and 1831, and the acquiescence of the public therein; 3. that they had not this right, by virtue of the act of 1832, the only effect of which, in regard to this company, was,

10   157
73   509

*Fairfield,*
*June, 1834.*

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

to restrict the location of the gate to that portion of their road, which is *South* of the point of intersection, leaving them, in other respects, to the enjoyment of all the rights they could claim under their original charter.

This was an information, in the nature of a *quo warranto,* filed by the attorney for the state, against *The Norwalk and Danbury Turnpike Company,* alleging, That the defendants, on the 11th of *November,* 1831, without any warrant or grant whatsoever, did, with intent to take toll of persons travelling upon the great market road from *Danbury* to *Saugatuck,* usurp the franchise of erecting, and, under colour and pretext of such usurped franchise, did erect, a toll-gate and fence on and across said highway, at a certain place *Northerly* of and above the intersection of said highway with the road of the defendants, (such point of intersection being *Northerly* of and above *Umpawaug Hill,*) in the town of *Danbury,* in front of the dwelling-house of *Ann Benedict ;* and from said 11th of *November* to this time, the defendants have usurped and do still usurp said franchise ; by means of which toll-gate and fence, said highway was so obstructed, that no horse, neat cattle or vehicle could pass thereon, unless said gate was opened ; and that the defendants did also usurp the franchise of keeping said gate shut and closed against all persons travelling on said highway, with horses, neat cattle or any vehicle, who should not pay thereat, to the defendants, the tolls specified in the information.

The information was filed at the term of the superior court, holden at *Fairfield,* in *December,* 1831.   The defendants appeared and entered a special plea ; to which the attorney for the state replied ; and thereupon issue was joined.

The cause was tried at *Fairfield, December* term, 1833, before *Williams,* J.

The jury gave a special verdict.   The facts found therein, together with those conceded by the pleadings, are the following. At the session of the General Assembly, in *October,* 1795, *Eliphalet Lockwood* and his associates were constituted a corporation, by the name of the *Norwalk and Danbury Turnpike Company.*   By the charter, among other things, it was provided : " That whenever said society shall have fully repaired said road from *Simpaug* brook in *Danbury* to *Belden's* bridge in *Norwalk,* and obtained a certificate thereof from the county court of *Fairfield* county, the said proprietors shall

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

be, and they are hereby authorized to erect and establish a turnpike on said road, in the most convenient place, to be by them determined ; at which turnpike the proprietors shall be, and they are hereby authorized to collect the following tolls," &c. On the 1st of *December*, 1795, the corporation was organized under this charter ; and before the 7th of *October*, 1796, they had fully repaired the road from *Simpaug* brook to *Belden's* bridge, and obtained a certificate thereof from the county court. On the day last-mentioned, they erected and established a turnpike gate on said road, at the *Georgetown* iron works, then in *Norwalk*, now in *Wilton ;* that place being determined by them to be the most convenient place on said road to collect the tolls allowed them, by their charter. The gate was kept at this place, about a year. It was then removed to the foot of *Honey Hill* in *Wilton*, on the *North* side thereof, where it was kept another year. From that place it was removed to a place in *Reading*, opposite the dwelling-house of *Burton Osborne*, where it was kept until the 20th of *June*, 1811 ; when it it was removed to a place opposite the store of *J. & B. A. Darling*, in *Reading*, where it was kept until the 9th of *July*, 1813. It was then removed to a place opposite the dwelling-house of *Azariah Coley* in *Reading*, where it was kept until the 11th of *November*, 1831 ; when it was removed to the place specified in the information, opposite the dwelling-house of *Ann Benedict*, in *Danbury*, where it was kept until the 16th of *November*, 1833. At all these places, the defendants collected the tolls allowed by their charter, during the time the gate was kept at such places respectively. At a session of the General Assembly, in *May*, 1832, *Munson Hoyt* and others were, on their petition, constituted a corporation, by the name of the *Simpaug Turnpike Company*, for the purpose of making and keeping in repair a new road from a point in the *East* line of the *Sugar Hollow Turnpike* road in the town of *Ridgefield*, about 67 rods *South-westerly* from the dwelling-house of *Moses Hubbell*, to a point in the *East* line of the *Norwalk and Danbury Turnpike* road in *Danbury*, near *Simpaug* brook. The charter of this company contained the following provisions : " Resolved further, that said *Simpaug Turnpike Company* shall keep and maintain in good and sufficient repair that part of the *Norwalk and Danbury Turnpike* road, which is situated *North-*

*Fairfield,*
June, 1834.
———————
State
*v.*
Norwalk and
Danbury Turn-
pike Company.

*erly* of the point where said *Simpaug Turnpike* road inter-
sects said *Norwalk and Danbury Turnpike* road, near the
dwelling-house formerly occupied by *Joshua Chapman*, de-
ceased, in the town of *Reading*, at all times after said *Sim-
paug Turnpike Company* shall have made said road, thus
laid out, and obtained liberty to erect a gate thereon, as afore-
said : *Provided,* that said *Norwalk and Danbury Turnpike
Company* shall not thereafter maintain a gate on their said
road, and collect toll thereat, *Northerly* of said point of inter-
section.    And said *Norwalk and Danbury Turnpike Com-
pany* shall have the right, at all times, to maintain a gate on
their said road and collect toll thereat, at any place *Southerly*
of said point of intersection, agreeable to the terms of their
original charter ; any law, usage or custom of the said compa-
ny to the contrary notwithstanding."    The *Simpaug Turn-
pike Company* made and put in repair said road, and built all
the necessary bridges thereon, before the 16th of *November,*
1833, to the satisfaction and acceptance of the commissioners ;
and on that day, erected a gate for the collection of tolls, at a
place on said road in *Reading*, near the dwelling-house of
*Joshua Chapman*.    At the same time, the *Norwalk and
Danbury Turnpike Company* removed their gate from its
position opposite the dwelling-house of *Ann Benedict*, to a
place on their road near the dwelling-house lately occupied by
*Joshua Chapman*, *Southerly* of the point where their road is
intersected by that of the *Simpaug Turnpike Company* ;
and at this place the gate was kept, at the time of trial.

It was alleged in the plea, and not denied in the replication,
" that all similar corporations, in this state, with like powers,
have, for more than forty years past, claimed, exercised and
enjoyed, and have been accustomed to claim, exercise and enjoy,
with the knowledge, sanction and acquiescence of the people of
this state, the right, from time to time, of changing and alter-
ing the location of their respective gates, as their own conven-
ience and that of the public required, to be by them determin-
ed."

The defendants having alleged in their plea, that the several
places at which they had successively erected their gate, partic-
ularly, the place mentioned in the information, and that to
which it was removed on the 16th of *November*, 1833, were
the most convenient places on their road, for the purpose, both

for the company and the public, within the true intent and meaning of their charter, the jury, supposing that this fact depended upon the right of the defendants to make the election, at the time of establishing the gate, found such fact one way or the other, according as the court should decide regarding such right of election.

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

The judge reserved the questions of law arising on the special verdict, in connexion with the pleadings, for the consideration and advice of this court.

*Sherman* and *Swift,* for the state, contended, 1. That the right of election of a place, given by the original charter, was exhausted, when the defendants had once established their gate, and could not be exercised *toties quoties.*

In the first place, this results from the obvious meaning of the terms. The words "to erect and *establish* a turnpike," import *permanency.* The words "in *the* most convenient place," import *one* place. "To be by them *determined,*" import that the place is not only to be selected, but to be *settled* and *fixed.* Such would be the construction in a grant by an individual. When a place is selected and determined, and the gate erected, have not the company "erected and established a turnpike on said road, in the most convenient place by them determined?" And if they have, what more than that was granted?

Secondly, a grant by the state, on petition, shall be construed *strictly,* and no more given than will satisfy the words of the grant; for the legislature here, like the king in *England,* acts for the state, *as trustee,* and not for itself; and nothing more than is expressed, shall go from the state, the *cestui que trust.* If the king grants land to an alien, it operates nothing; for the *power to hold it* is not granted, and shall not be given by implication. 2 *Bla. Com.* 351.

Thirdly, the legislature had regard to the *then* state of the country, and knowing that such a power of election might *then* be granted safely, granted this power; but *future* circumstances might render it dangerous; as if a village should spring up, and a gate be set in the midst of it, or roads *cross* this to other markets, and the gate be made to obstruct them. If the company have any power to "determine" the place of the gate, it is assumed that they are judges of the reasonable-

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

ness of its exercise; and the charter reserves no power to repeal or restrain.

2. That the fact that similar corporations, with like powers, have done the same thing, with the acquiescence of the people, is of no avail.

First, the acquiescence of the people in the acts of others, does not prove that they would acquiesce in this act.

Secondly, if their acquiescence is intended to shew, that such is the legal construction of such a charter, then the matter is not *issuable*, and is not admitted, by not being replied to; for the law cannot be shewn, by proving the opinion of the people. Could the allegation be denied and put in issue, by good pleading, it would be shewn to be false.

Thirdly, if such an allegation were allowable, *this* is insufficient; for it does not shew, that any number whatever of such incorporations, with like charters, exist; nor that they are common or general; and the court cannot know that they are so; for they are private corporations, not known to the law.

3. That the act of 1832, incorporating the *Simpaug Turnpike Company*, did not authorize or sanction the location complained of.

First, this act purports to grant no *new* powers, and recognizes none. It merely authorizes the defendants to maintain a gate *Southerly* of the point of intersection, "*agreeable to the terms of their original charter.*" If they could not establish their gate at the place complained of, by the terms of their charter, the right to do it is not given, or recognized, by the act of 1832.

Secondly, if the legislature has not *added* to its original grant, it has done nothing; for the legislature cannot *construe* its grant: *that* belongs to the court.

Thirdly, the defendants cannot avail themselves of this act, because they were not party to the petition; but it was altogether *res inter alios acta.* It was passed, moreover, during the pendency of this information, without notice to those who were principally to be affected by it.

Fourthly, it does not appear, that the defendants ever *accepted* this grant; and their charter reserves to the legislature no power of alteration. Consequently, they not being bound, and not having a right to accept the grant *in part*, taking that only which is beneficial, the act has no effect.

*Betts* and *Booth*, for the defendants, insisted, 1. That by the true construction of their charter, they had good right to elect in the manner they had done.

2. That after enjoyment by the defendants of their corporate franchise, for more than thirty years, the law will not disturb them. *Rex* v. *Latham* & al. 3 *Burr.* 1485. *Winchelsea* cases, 4 *Burr.* 1962. *Rex* v. *Dawes,* 4 *Burr.* 2022. 2120. *The King* v. *Dickin,* 4 *Term Rep.* 282. 284. *The King* v. *Peacock,* 4 *Term Rep.* 684. 4 *Cowen* 103, 4. note, by the reporter.

3. That the act of 1832 expressly authorizes the defendants to maintain their gate at any place *Southerly* of the intersection of the *Simpaug* road. This act is operative, not merely as a *legislative construction* of the original charter, but as an *additional grant.* If foreign to the principal subject, this would not render the grant void. But it was not foreign. The new company took a part of the defendants' road ; in consequence of which, it became necessary and proper to make the provision in question. At any rate, the legislature is the constitutional organ, through which the will and the sovereign power of the state are exercised ; and *the state* cannot say, that this will or this power was exercised improperly.

WILLIAMS, J. This is an information in nature of a *quo warranto*, against the defendants, for erecting a turnpike gate on their road near Mrs. *Benedict's,* and *North* of *Umpawaug Hill.* The facts are found in a special verdict ; and the questions of law reserved. The defendants justify, 1. by the words of their charter ; 2. by the construction which long usage and acquiescence have furnished ; 3. by the act of 1832, incorporating the *Simpaug Turnpike Company.*

The first inquiry is, does the act of incorporation authorize the location of the gate in this place ?

The charter empowers the proprietors to erect and establish a turnpike for the collection of tolls, in the most convenient place, to be by them determined. And it is a fact found, that the place originally determined upon, was the *Georgetown* iron works ; and although there have been several removals, it was not placed where it was at the time of this complaint, until *November,* 1831, about thirty-five years after its first location. The proprietors then having the right to select such location as

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

*Fairfield*,
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

they should determine was a convenient one, did actually fix this location, in the year 1796. And the general rule, certainly, is, as to contracts, that when an election is given, and the person to whom it is given determines, that determination is final. 1 *Rol. Abr.* 726. *l.* 15. *Com. Dig. tit.* Election. C 2.

It is claimed, however, that the rule is not applicable to cases of this character ; as the circumstances which render it convenient or otherwise, are constantly varying. So are often the motives which influence the mind in determining on other subjects.

But let us look at the grant itself. Does it purport to give power to change, from time to time, the location of the gate, as circumstances may vary, or opinions fluctuate ; or merely to determine its original location ? It gives a power to erect and establish a gate in the most convenient place, which is to be determined, by the proprietors themselves. As the power is not given to commissioners, but to the proprietors, whose interest may not always coincide with the convenience of the public, to be exercised at their discretion, this authority ought not to be extended, by construction.

What, then, do these words import ? They give power to *erect* and *establish* a gate. Now, these words are claimed to be synonymous. If so, one of them can mean nothing ; or we may suppose, that one was intended to add to the effect of the other. The power of location is certainly given, by the first term, *erect*. This gives them power to put the gate in a convenient place. This perhaps would imply, that it was to be continued there ; but the charter goes further : they may erect and *establish* a gate ; that is, fix, settle or confirm it. It is, then, to be erected and permanently confirmed, in the place these proprietors shall determine. And in the year 1796, they did determine, that it should be fixed or established at the iron works. It would seem, then, that they had completely executed the power and exhausted it.

It is said further, that it is to be placed where they shall judge it *convenient ;* and that circumstances may make one place convenient, at one time, and another place, at another time. But if it was intended, that this should affect the power, nothing would have been more easy than to have added—*and the same vary from time to time, as convenience may re-*

*quire.* So far from this, the terms used do not import such an authority.

This opinion is much confirmed, by that of the supreme court of *New-York*, in the case of *Griffen* v. *House*, 18 *Johns. Rep.* 397. There the *East* gate was to be at such place, near the *Massachusetts* line, as the president and directors should direct. They erected the gate one mile and three quarters distant from that line; afterwards, removed it *East*, about a mile from the line of *Massachusetts*. It was again removed to a place two miles and three quarters from that line. The court held, that it was not *near* the line, within the act; but added further, that they inclined to the opinion, "that where the discretion had once been exercised, the power is exhausted, and cannot be revived so as to authorize the company to change and move the gate to suit their convenience, without some strong and manifest necessity to warrant it. Here the company have acted capriciously, and have lost sight of the trust reposed in them, by changing, several times, the location of the *Easterly* gate, contrary to their first opinion, and without any apparent necessity for it." By the terms of the charter, therefore, the company had no right to place the gate at Mrs. *Benedict's.*

It is claimed, however, that having exercised the right of removal for almost forty years, they cannot now be disturbed; and cases are cited where the court have refused to grant an information. It is true, that the courts in *Great-Britain* have now a rule, that they will not grant such information after a quiet enjoyment even of six years. *The King* v. *Dickin*, 4 *Term Rep.* 282. Before this rule, it would seem, that when such a writ was granted, the right must be settled as in other cases. *Rex* v. *Latham*, 3 *Burr.* 1486. Be that, however, as it may, the gate complained of had not been in the position it then was sixty days before the information was filed; and cannot, therefore, claim the sanction of long enjoyment.

It is said, that the repeated removals which have taken place, are evidence of an acquiescence on the part of the public, and give a construction to the charter. Not one of these removals, until the one complained of, placed the gate *North* of *Umpawaug Hill;* and it is not easy to see how the removal from place to place *South* of that point, can be evidence of acquiescence in its being located some miles *North* of that point.

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

HARVARD LAW LIBRARY

*Fairfield,*
June, 1834.
————————
State
*v.*
Norwalk and
Danbury Turn-
pike Company.

Those now much interested might feel it of no importance to them in which of the positions it was *South* of that hill, and yet have a deep interest that it should not come *North* of it. As to these removals giving a construction to the charter; if the terms of the charter were ambiguous, acts done under it, for a course of years, would certainly have weight in ascertaining the true construction. But the fact that the gate had been removed, several times, *below* a certain point, would not import a right to remove it to any other place upon that road *above* that point. There is, then, no usage, which will justify the removal.

The only remaining question arises under the act of 1832; by which it is provided, that the defendants shall have " the right, at all times, to maintain a gate on their said road, and collect toll thereat, at any place *Southerly* of said intersection, agreeable to the terms of their original charter." With respect to this act, it is to be remarked, that it was passed after the information was filed, not upon the petition of this company, not upon any notice given of any application for this purpose, and not upon request of any person directing that it should be done. It is not to be presumed, that under such circumstances, the legislature intended, in this summary manner, to interfere with the rights of parties litigating before this court; for although the state is here a nominal party, it cannot be concealed, that individual interests are deeply involved in this subject.

By this act, this company are exonerated from keeping in repair the *North* part of that road ; and that burden is imposed upon the newly incorporated company. They are also enjoined not to place a gate *North* of the point of junction of the new road with theirs ; and they have, in consequence, removed the gate *South* below that point where the *Simpaug* turnpike intersects theirs, but *North* of *Umpawaug Hill.* After this injunction, the act proceeds to allow them to collect toll, at any place *Southerly* of the point of intersection, *according to their original charter.* The fair construction of this act, is, to leave this company to enjoy all the rights granted by their original charter, except that of placing the gate *North* of the point of intersection. Whether that right existed before or not, the legislature do not pretend to determine ; but as there is a gate now there, and as the road is no longer to be supported by that company, it is declared, they shall not have their gate upon the

road of another company ; leaving them, as to all other claims, to the enjoyment of all the rights they could claim under their original charter.

*Fairfield,*
June, 1834.

State
*v.*
Norwalk and
Danbury Turn-
pike Company.

Such a construction of the act incorporating the *Simpaug Turnpike Company*, does entire justice to the *Norwalk and Danbury Turnpike Company*, without leading to a construction, which involves these absurdities, that the legislature intended, or did actually grant, a privilege to this company, when they did not ask it ; without any notice to persons interested ; while a litigation was pending upon this very subject ; and when the very same act exonerated the company from much of the burden, which would entitle them to this privilege.

The result is, that the superior court must be advised to render judgment against the defendants, that the company surrender the franchise claimed by them to place a gate *North* of *Umpawaug Hill ;* and that no fine be imposed, or costs taxed.

DAGGETT, Ch. J. and CHURCH, J. were of the same opinion.

PETERS and BISSELL, Js. gave no opinion ; the former being absent, and the latter being related to one of the stockholders of the *Norwalk and Danbury Turnpike Company.*

Judgment to be rendered
for the State.