NORTHERN PACIFIC RAILWAY COMPANY, Appellant, vs. DOHERTY, Respondent.

*January 12 — June 23, 1898.*

*Railroads: Land grants: Selection of terminus: Consolidation of companies: Maps of proposed route: Unauthorized filing.*

1. The act of Congress, July 2, 1864, authorizing the Northern Pacific Railroad Company, thereby incorporated, to construct a railroad, "beginning at a point on Lake Superior, in the state of Minnesota

or Wisconsin, thence westerly by the most eligible route . . . to some point on Puget Sound," left the exact location of both termini to the decision of the corporation itself.

2. Under said act, the selection of a terminus, once deliberately made, was final and exhausted the power of choice.

3. The company was not, however, by the terms of the act, confined to a single point on Lake Superior; and, the shore line of the lake being parallel with the necessary route of the proposed railroad, the mere fact that the road had touched a harbor at the west end of the lake did not deprive the company of power to select, as its terminus, a point farther eastward on said lake.

4. The purchase by the Northern Pacific Railroad Company of a half interest in the track of another company between Duluth and a point west thereof, and the operation of the same, in connection with its main line westward, both in common with such other company and under a lease of the other company's lines, did not constitute a consolidation, confederation, or association of the two companies such as was contemplated and authorized by sec. 3 of the act of 1864, or amount to a practical selection of Duluth as the eastern terminus of the Northern Pacific Railroad Company such as would preclude the selection of some other point for such terminus, especially since the act of Congress required that the Northern Pacific Railroad Company should obtain the consent of the legislature of any state through which its line might pass, and the consent of the legislature of Minnesota had been given with a proviso that, if the eastern terminus of the road should be located east of that state, then the company should construct or cause to be constructed a line from its main line to the waters of Lake Superior within the state of Minnesota.

5. A map showing a proposed route for the proposed railroad, filed with the Secretary of the Interior by the president of the Northern Pacific Railroad Company, without any authority from its board of directors or otherwise, and rejected by the land commissioner and the Secretary because it did not comply with the rules and regulations of the land department, did not operate as a selection by the company of the eastern terminus shown thereon.

APPEAL from an order of the superior court of Douglas county: CHARLES SMITH, Judge. *Reversed.*

This is an appeal from an order appointing commissioners in condemnation proceedings upon the petition of *Doherty*. *Doherty* owns the S. W. ¼ of section 4, township 47 N., of

range 11 W., in Douglas county, Wisconsin, having made a homestead entry thereof November 8, 1882, and obtained a patent February 6, 1890. The appellant claims a right of way from east to west 100 feet in width across this quarter section upon which its railway line is constructed and operated. This right of way has never been acquired by the appellant or its grantor, the Northern Pacific Railroad Company, by purchase or by condemnation, but the appellant claims it by virtue of the terms of the act of Congress approved July 2, 1864, incorporating the Northern Pacific Railroad Company, and granting to it, among other rights and privileges, a right of way through the public lands of the United States. This act authorized the corporation thereby created to construct a railroad " beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin," westward to " some point on Puget Sound," and the controlling question in this case is whether the eastern terminus of the railroad constructed under the act is at Duluth, Minnesota, or at Ashland, Wisconsin. If at Duluth, then the company acquired no right of way over any public lands in Wisconsin, but if at Ashland, then it did acquire right of way over public lands in Wisconsin, including the land in question, by virtue of the act of incorporation.

The facts were not in dispute, and were all settled by a written stipulation. From this stipulation the following facts appear:

On July 2, 1864, the land in question was public land of the United States. On November 8, 1882, the petitioner, *Doherty*, made a homestead entry thereof, and thereafter complied with the homestead laws, and received a patent from the United States, purporting to convey the lands, February 6, 1890. In December, 1883, the Northern Pacific Railroad Company took possession of the strip in controversy, and constructed a railroad upon it, and remained in possession operating the railroad until August 31, 1896, when

all the property, rights, and franchises of said railroad company were sold to the appellant, the *Northern Pacific Railway Company*, a Wisconsin corporation, which is duly organized to operate said railroad, and has occupied said strip for railroad purposes.

The Northern Pacific Railroad Company, of which the appellant is the successor in interest, was organized by, and obtained its rights under, an act of Congress approved July 2, 1864, and entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route." By the first section of this act, a corporation created thereby was authorized to lay out and construct a continuous railroad and telegraph line beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin, thence westerly upon the most eligible route, as shall be determined by said company, within the United States and north of the forty-fifth degree of latitude, to some point on Puget Sound. By the second and third sections of the same act the right of way through the public lands of the United States was granted to said railroad company, its successors and assigns, for the construction of the line, and it was also provided that, if its route should be found to be upon the same general line as the route of another railroad which owned a previous land grant from the United States, the amount of said previous land grant should be deducted from the amount granted by this act, provided that the railroad owning the previous grant might assign its interests to the Northern Pacific Railroad Company, or might consolidate, confederate, and associate with said company upon the terms named in the first section of the act. The lands granted to the Northern Pacific Railroad Company by the act amounted to ten alternate sections per mile on each side of the line within the states, and twenty alternate sections in the territories, with a ten-mile indemnity limit, and by resolution

of Congress of May 31, 1870, an additional indemnity belt ten miles in width was created on each side of the line. This act was accepted by the company within the time required by law.   The act also required the company to procure legislative consent of the states through which it was to run before its construction, and in the year 1865 the legislatures of Minnesota and Wisconsin gave such consent.   The Minnesota act provided that, if the eastern terminus of the road should be located east of the eastern boundary of Minnesota, then that the company should construct or cause to be constructed a railroad from its main line to the navigable waters of Lake Superior at some point within the state of Minnesota.

In 1870 the company located its general route from the mouth of the Montreal river in Wisconsin, across Wisconsin and Minnesota, to a point on the Red River of the North, near Fargo, and transmitted a map showing this location, August 13, 1870, to the Secretary of the Interior.   This map showed the proposed general route to commence at the mouth of the Montreal river; thence a little south of west upon a direct line to a point directly south of, and about six miles distant from, the south end of Chequamegon Bay; thence a little north of west upon a direct line crossing the state boundary between Wisconsin and Minnesota at or near the point where the St. Louis river becomes such boundary. Upon receipt of this map, the Secretary of the Interior transmitted it to the land commissioner, with instructions to withdraw from sale, homestead, and pre-emption all odd-numbered sections of land within twenty miles of the line within both states.   This order was complied with by the land commissioner by directions given to the district land officers at Bayfield, Wisconsin.   Such withdrawals were made, and the price of the even-numbered sections was raised to $2.50 per acre, and thereafter large quantities of such land were sold by the government at the rate of $2.50 per acre.

In 1882 a map of definite location of said railroad from a point upon the St. Paul & Duluth Railroad, now called "Thompson Junction," eastward to a point in section 15, township 47 N., of range 2 W., in the state of Wisconsin, was prepared, and approved by the directors, and certified and forwarded to the Secretary of the Interior. The line of definite location laid down on this map followed substantially the line of general location upon the prior map, but it turned to the north, and touched Superior, and also Ashland, and stopped some ten miles west of the mouth of the Montreal river. Upon receipt of this map of definite location the land commissioner, by direction of the Secretary of the Interior, adjusted the land grant in accordance with it, and prepared diagrams showing the limits of the grant and indemnity belts, and transmitted such diagrams to the district land officers, with the proper directions as to the withdrawal of lands, which were complied with.

August 2, 1884, the directors of the Northern Pacific Railroad Company adopted a resolution fixing the eastern terminus of the railroad at the city of Ashland, which resolution was duly certified and transmitted to the commissioner of the general land office December 3, 1884. Thereafter the commissioner prepared a diagram showing the final eastern terminus of the line at Ashland, and sent the same to the district officers at Bayfield, with instructions to adjust the grant on this basis. The point so fixed is on the line of definite location of July 6, 1882, but about twelve miles west of the east end of that line.

The Northern Pacific Railroad Company constructed a continuous line of railroads from the city of Ashland to Puget Sound in all respects in accordance with its act of incorporation, and the whole line has been duly accepted by the President of the United States, as provided in that act. That portion of the road extending east from Thompson Junction was constructed upon the line of definite location

shown in the map of 1882, and was constructed during the years 1881, 1882, 1883, and 1884. The first section extended from Thompson Junction to Superior, and was examined and reported favorably upon by commissioners in 1882, and the recommendations were approved by the President September 16, 1882. The second section, extending from Superior to the Brule river, was constructed in the latter part of 1883, and crossed the land in question here, and was approved in like manner January 31, 1884. The third section extends from the Brule river to Ashland, and was approved in like manner February, 1885.

It appears further that March 6, 1865, one Joshua Perham, then the president of the Northern Pacific Railroad Company, transmitted to the office of the land commissioner a map purporting to show the proposed general route of the Northern Pacific Railroad. Upon this map there appeared two lines from a point in the present state of North Dakota eastward, one terminating upon Lake Superior at or near Duluth, and the other extending into Wisconsin some distance south of Lake Superior, and terminating at the mouth of the Montreal river; this last-named line being apparently partially obliterated by a wavy red line. This map was accompanied by a letter from Perham, stating that it shows the general line of the Northern Pacific Railroad from a point on Lake Superior, in *Wisconsin*, to a point on Puget Sound. The Secretary of the Interior transmitted this map to the land commissioner, suggesting the withdrawal of the lands along the line, but the land commissioner soon afterwards transmitted a letter to the Secretary of the Interior recommending that the map be rejected, for the reason that the same did not comply with the rules of the land department, which recommendation was approved by the Secretary. There is nothing to explain the apparent alteration of this map, nor to show when it was made, and it is not shown that the directors of the company ever authorized the

making or filing of the map, but it appears that the president of the company had no power to make or file it.

By act approved May 5, 1864, Congress granted ten sections of land per mile to the state of Minnesota to aid in the construction of a railroad from St. Paul to Lake Superior. In the same year the legislature of Minnesota conferred this grant upon the Lake Superior & Mississippi Railroad Company, a Minnesota corporation, and afterwards known as the St. Paul & Duluth Railroad Company. On January 1, 1872, this company had constructed and was operating a railroad from St. Paul to Duluth by way of Thompson Junction, which is upon the St. Louis river, and is the point from which the Northern Pacific Railroad Company started to build its line westward. On the last-named date, the Northern Pacific Railroad Company purchased a one-half interest in that part of this road extending from Thompson Junction to Duluth for the sum of $500,000, and received a deed therefor. On the same day the two companies made a written agreement providing for the operation of trains and the maintaining of the road. On May 1, 1872, the Northern Pacific Railroad Company and the Lake Superior & Mississippi Railroad Company made a further agreement by which the lines of the Lake Superior & Mississippi Railroad were leased to the Northern Pacific Railroad for an annual rental, the land grant of the Lake Superior & Mississippi Railroad being expressly excepted from the operation of the lease. Pursuant to this lease the Northern Pacific Railroad Company operated the entire railroad thus leased from May 1, 1872, until February 1, 1874, when it surrendered the lines leased, and relinquished all its interests under the lease, but surrendered no rights under the deed. On the 12th of May, 1874, the Northern Pacific Railroad Company and the Lake Superior & Mississippi Company made an agreement for the operation of the line from Thompson Junction to Duluth.

It further appears that by act approved May 5, 1864, the

United States granted lands to the state of Wisconsin to aid in the construction of a railroad from Bayfield to Superior, but no road was constructed under this grant.

*James B. Kerr*, for the appellant.

For the respondent there was a brief by *Crownhart & Foley*, and oral argument by *W. R. Foley*.

WINSLOW, J. The grant of a right of way across the public lands of the United States by the act of July 2, 1864, was a grant *in præsenti*, and took effect when the route was definitely fixed by relation as of the date of the act. *St. Paul & P. R. Co. v. N. P. R. Co.* 139 U. S. 1. The route was definitely fixed across the petitioner's land before he made his entry thereof, and the controlling question is whether the eastern terminus of the Northern Pacific Railroad was located at Duluth, Minnesota, or at Ashland, Wisconsin. In the former case the company took no right of way over public lands in Wisconsin, and must now condemn and pay for the land in question; but in the latter case it is entitled to the right of way which it is using over the petitioner's land under its grant. The act left the exact location of both termini of the proposed railway undetermined. It was to begin at a point on Lake Superior, in Minnesota or Wisconsin, and end at "some point" on Puget Sound. That this course was adopted in order to leave the question of the exact termini to the decision of the corporation itself cannot be doubted. The debate upon the bill in the House of Representatives clearly shows that this was the intention (see remarks of Mr. Sweat, Cong. Globe, 1st Sess. 38th Cong. p. 1699), and such was undoubtedly the legal effect of the language used. When such discretion is vested in a corporation, its decision will not be interfered with unless it has exceeded the limits of its discretion, or bad faith in the selection is shown. *Fall River I. W. Co. v. O. C. & F. R. R. Co.* 5 Allen, 221; *Parke's Appeal*, 64 Pa. St. 137. Un-

doubtedly, also, if the selection of a terminus be in fact once deliberately made, the power of choice is exhausted, and the determination is final.  Pierce, Railroads, 254; *State v. N. & D. T. Co.* 10 Conn. 157; *Hudson & D. Canal Co. v. N. Y. & E. R. Co.* 9 Paige, 323.

It is claimed by the petitioner — and such was the decision of the trial court — that the Northern Pacific Company definitely located its eastern terminus at Duluth, January 1, 1872, when it purchased one half of the track and right of way of the Lake Superior & Mississippi Railroad from Thompson Junction to Duluth, and made a contract for operation of the line in common.  On the other hand, the appellant company claims that these transactions did not constitute a location or selection of the eastern terminus of the road, but that the line from Thompson Junction to Duluth simply constituted a branch line, as authorized and required by the laws of the state of Minnesota, and that the eastern terminus was not definitely located until the passage of the resolution of the board of directors of the Northern Pacific Railroad Company, August 2, 1884, fixing the terminus of the road at Ashland, Wisconsin.  The petitioner's contention is based upon, and fully supported by, two decisions by the Secretary of the Interior, made respectively November 13, 1895, and August 27, 1896.  *In re Northern Pacific R. Co.*, reported in 21 Land Dec. Dep. Int. 412, and 23 Land Dec. Dep. Int. 204.  These decisions were rendered upon application by the Northern Pacific Railroad Company to select indemnity lands in North Dakota to make up for lands lost within the limits of its grant in Wisconsin.  In the first of these decisions it was held that the company had no land grant east of Superior, because its eastern terminus was either at Duluth or Superior, and in the second it was held that it had no land grant east of Thompson Junction.

The argument in support of these decisions is that the railroad company was only entitled to touch one point upon

Lake Superior; that when it purchased the half interest in the Lake Superior & Mississippi Railroad track from Thompson Junction to Duluth, and began to operate it in connection with its main line to the west, such action constituted a consolidation or association with said latter company within the meaning of the act of incorporation, and, taken in connection with the actual operation of such line for ten years, definitely located the eastern terminus of the road at Duluth, whereby it exercised finally its right of selection of a terminus; that the subsequent filing of maps and resolutions showing an intention to fix the eastern terminus at or near Ashland was of no effect, because the right to select the eastern terminal had been exhausted; and that the approval of such maps, and the acts of the department in withdrawing from sale lands in Wisconsin within the place limits, as well as the acceptance, by the executive department, of the road from Thompson Junction to Ashland, could not be considered as adjudicating the terminal right, because, after the terminal had been fixed, no act of the land department or of the executive could confer any right in the matter.

Notwithstanding the strength of the argument made by Secretary Smith in these decisions, we find ourselves unable to agree with his position. The claim that the company was necessarily confined to a single point upon Lake Superior by the terms of its grant does not seem to us sound. This contention is based upon the opinion of Secretary Lamar in *In re Atlantic & P. R. Co.* 4 Land Dec. Dep. Int. 458, and upon the case of *U. S. v. S. P. R. Co.* 146 U. S. 570. In those cases a land grant was made to the company to aid in building a railroad to begin near Springfield, in Missouri, thence to the Colorado river, and "thence west by the most practicable and eligible route *to the Pacific.*" The company filed maps of its route showing that it reached the Pacific at San Buenaventura, and then extended northward along the coast

380 miles, and made San Francisco its terminus, claiming that its land grant extended to San Francisco. This claim was overruled by the Secretary and by the court on the ground that when the line reached the Pacific Ocean at San Buenaventura that point became the western terminus. It had constructed a line "to the Pacific," and its grant went no further. This view seems reasonable in consideration of the terms of the act and the situation in that case. ·The road was to run "to the Pacific." The Pacific coast was nearly at right angles with the route of the road, and to hold that it might, after reaching the Pacific, turn northward out of its course and run several hundred miles along the coast to another port, would be evidently not within the intention of the grant.

In the present case, however, the line was to commence at a "point on Lake Superior," meaning, of course, a shipping point. Lake Superior lies with a long finger pointing westward. Both of its coast lines are practically parallel with the necessary route of the proposed railroad. Now, it certainly could not have been contemplated that the railroad must start at the nearest or most westerly point on Lake Superior, because that would fix the terminus at Duluth and nowhere else, and make it impossible to start in Wisconsin; and it was as certainly the purpose of the act to leave the " point " undetermined, and to give the company a choice of shipping points at which to make their terminus, either · in Wisconsin or Minnesota. Had the company at once filed their maps showing Ashland as the eastern terminus, and commenced the construction of their line westward from Ashland, we apprehend no one would have seriously claimed that they were outside of their charter rights, even if the road touched Superior in its course westward. Having selected legitimately " a point " on Lake Superior, and one well calculated for their purpose, and not having gone out of their natural route to do so, what good reason could be

given for saying that they had transcended their powers? Certainly, the fact that they have touched at Superior, and thus added to the commercial facilities of the public, can hardly be a good reason for denying the power. The company, being entitled to start from any available point on Lake Superior in Wisconsin, had the right, it seems to us, to make Ashland that point; and then, having done so, its rights can hardly be curtailed by the fact that the shore of the lake runs parallel with its necessary route, so that in proceeding westward its line naturally and almost unavoidably touches another harbor. So we do not consider that the company was in any way prevented from making Ashland its eastern terminus or from touching at Superior upon its route westward.

But it is said — and this is perhaps the most serious objection — that in 1872 the company made a practical selection of Duluth as its terminus by the purchase of a half interest in the Lake Superior & Mississippi track from Thompson Junction to Duluth, and by operating the same thereafter with its own trains. The Lake Superior & Mississippi was a land-grant railroad, and it is said that this purchase and the subsequent running agreements constitute a consolidation, confederation, or association of the two roads such as was contemplated and authorized by the third section of the act of incorporation, so that, as matter of fact, the road from Thompson Junction to Duluth became a part of the trunk line contemplated by Congress; and it is said that, unless it be so held, the Northern Pacific Railroad Company had no authority or power to make such purchase or running arrangements. Certainly, neither the purchase of one half of the roadbed of the Lake Superior & Mississippi Company, nor the subsequent operation of the roadbed in common, nor the leasing of the entire road, constituted a consolidation of the two corporations in any legal sense. Consolidation of two corporations properly may be said to take place when

the shareholders of both form a new one and dissolve the former corporations. Morawetz, Priv. Corp. § 939. It has been also held to include a case where one corporation is enlarged and survives, issuing stock to the stockholders of the other corporation, which is dissolved and becomes merged in the former. *Meyer v. Johnston*, 64 Ala. 656. But nothing of the kind happened in the present case. Both corporations maintained their separate corporate existence. They simply became owners in common of a short piece of road, and made contracts with each other regulating its operation in common. It may be said that they associated themselves together, and in a certain sense this is true, but not in the sense contemplated by the act. The words " confederate and associate " are used in conjunction with the word " consolidate," and the familiar rule of *noscitur a sociis* plainly applies. Furthermore, the act says that this consolidation, confederation, or association is to be " upon the terms named in the first section of the act." The first section of the act creates the corporation, names the corporators, enumerates the corporate powers, provides for the first meeting of the corporation, names its officers and their duties, and provides for subscriptions for stock. These are the only " terms " named in the first section. It does not seem very clear what the words " upon the terms named in the first section " mean, but, if they mean anything, we think they must mean that the consolidation or association intended is one which results in a corporation combining the two corporations in one, thus satisfying the legal definition of consolidation, and not a mere ownership and operation in common of a piece of track, or a rental by one company to another of its road.

Moreover, a plain and adequate reason appears to have existed for the purchase of an interest in the line from Thompson Junction to Duluth entirely outside of the consolidation provision. Sec. 18 of the act of incorporation provided that the Northern Pacific Railroad Company

should obtain the consent of the legislature of any state through which any portion of its line might pass, before commencing the construction thereof. By the act of the legislature of Minnesota approved March 2, 1866 (ch. 69, Sp. Laws of 1865), the consent was given, provided that, if the eastern terminus of the road was fixed east of the state, then the Northern Pacific Railroad Company should construct, or cause to be constructed, a line from its main line to the navigable waters of Lake Superior within the state of Minnesota. It thus became necessary for the company to comply with the terms of the proviso, provided it fixed its eastern terminus in Wisconsin; and by its act of incorporation it was vested with all the powers and privileges necessary to carry into effect the purposes of the act. In August, 1870, it located its proposed general route, and transmitted to the Interior department a map of such location, showing its eastern terminus to be in Wisconsin, at the mouth of the Montreal river, which map was approved by the Secretary of the Interior. Thus the condition contemplated by the proviso came into being, and it was necessary to construct a line from its main line to some Minnesota port on Lake Superior. This could be substantially complied with by the purchase of an existing line as well as by the construction of a new one, and we therefore conclude that the purchase of one half of the track of the Lake Superior & Mississippi Railroad from Thompson Junction to Duluth was simply a compliance with the proviso placed upon the Northern Pacific Railroad by the Minnesota legislature, and was not a location of the eastern terminus of the road.

The result of these conclusions seems necessarily to be fatal to the petitioner's case. One further claim should, however, be noticed. On March 6, 1865, one Josiah Perham, then president of the Northern Pacific Railroad Company, filed with the Secretary of the Interior a map showing a

proposed route of the proposed railroad. On this map there appear two lines from a point in North Dakota to Lake Superior, one ending at Duluth and one at the mouth of the Montreal river. This latter line is partially obliterated by a wavy red line through its whole length. It appears affirmatively that the president had no authority to make or file this map, and that the directors never authorized it, and, further, that on June 22, 1865, the map was rejected by the land commissioner and Secretary of the Interior because it did not comply with the rules and regulations of the land department. No further action was ever taken upon it, and it seems too plain to require argument that it can cut no figure in the case. All the subsequent maps made and filed by the corporation, as well as its recorded acts, show the clear intention to make the eastern terminus of the road in Wisconsin. In 1870 a map of general route was filed, showing the eastern terminus to be at the mouth of the Montreal river, upon receipt of which the odd-numbered sections of land within twenty miles of the line were withdrawn from sale, homestead, and pre-emption entry within the states of Minnesota and Wisconsin, and the price of land in the even-numbered sections was raised to $2.50 per acre, and large quantities of land sold by the United States at that price. In 1882 a map of definite location of the line from Thompson Junction eastward to a point in section 15, town 47, range 2 west of the fourth P. M. was filed in the land office at Washington. This line passed through Ashland, and terminated a few miles east of that city. This map was approved, and the land grant adjusted in accordance therewith by the department. In August, 1884, the board of directors of the company by formal resolution fixed the eastern terminus of the road at Ashland, and a certified copy of the resolution was filed in the general land office in December, 1884, whereupon the land commissioner made a diagram showing the eastern terminus so fixed, and adjusted the

grant in accordance therewith. The portion of the road extending eastward from Thompson Junction to Ashland was constructed in the years 1881, 1882, 1883, and 1884, and was examined in three sections by commissioners appointed by the President of the United States, as provided by the act of incorporation. The commissioners reported favorably upon all of these sections, and their recommendations were approved by the President, the last approval being dated February 6, 1885. All of these deliberate acts of the department and executive officers are brushed aside by Secretary Smith on the ground that the terminus of the road had been unalterably fixed at Duluth by the action of the Northern Pacific Company in 1872. As we do not agree with the Secretary's premise, we cannot agree with his conclusion, and therefore hold that the terminus of the road is at Ashland, and hence that the railroad company had a right of way across the petitioner's land by virtue of the provisions of the act of incorporation.

*By the Court.*— Order reversed, and cause remanded with directions to dismiss the petition.

BARDEEN, J., took no part.