STATE OF SOUTH CAROLINA ex rel. CUNNINGHAM et al. v. JACK et al.

JACK v. WILLIAMS et al.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1906.)

No. 463.

RAILROADS—DUTY OF PURCHASERS TO OPERATE—INSOLVENCY—REBUILDING.

A railroad company was chartered to construct a line from Greenville, S. C., to Knoxville, Tenn. Only 12 miles from Greenville had been built when the whole scheme collapsed because of lack of funds. The 12 miles ended in the woods, and after the appointment of a receiver he borrowed $12,500 on receiver's certificates to build 3 miles more to reach a town. The receiver operated the road for four years without being able to pay any interest or the principal on the receiver's certificates, or to pay himself anything for his services, or to keep the road in repair. Its operation was then discontinued, and after three attempts to sell the road at public auction, it was purchased by the holders of the receiver's certificates for $15,000. The franchise became forfeited because of the purchasers' failure to organize a corporation to operate the same within 60 days, as required by Rev. St. S. C. § 1610, and after an expert had reported that $10,000 would be required to render the road safe to operate for a year, the receiver was permitted to dismantle the road, and sell the rails and rolling stock. *Held* that, though the state was not a party to such proceedings, the purchasers were not bound, several years after the railroad had been dismantled, to replace the same in the same condition it was when dismantled, in order that the road could be operated by others as a public highway.

Appeal from the Circuit Court of the United States for the District of South Carolina, at Charleston.

For opinion below, see 113 Fed. 823.

J. W. Barnwell (B. M. Shuman, on the brief), for appellants.

B. A. Hagood, T. P. Cothran, M. F. Ansel, and S. J. Simpson, for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. This is an appeal from the decree of the Circuit Court (Simonton, Circuit Judge) entered February 1, 1902, dismissing the cross-bill of the appellants filed in the case of Jack, plaintiff, against Williams and Beattie, defendants. The original case of Jack, a citizen of Georgia, against Williams and Beattie, citizens of South Carolina, was filed in the Circuit Court of the United States for the District of South Carolina, at Charleston, in April, 1897, alleging that under a decree of that court entered August 17, 1892, directing a foreclosure sale of the property, rights, and franchises of the Carolina, Knoxville & Western Railroad Company, said Williams was the highest bidder at said sale, and had become the purchaser of the 15 miles of railroad sold under that decree for $15,-000. The bill in the original case further alleges that, although Williams was the purchaser reported to the court, and to whom the legal title of all said property was conveyed, that the complainant Jack and said Beattie and Williams had jointly furnished the purchase money, and that under an express agreement Williams held the title for the joint benefit of himself and the said Jack and Beattie. The bill alleged that the railroad as projected had been intended to extend from Hambury, N. C., to Knoxville, Tenn., but that only 12 miles had been completed, which had been hastily and imperfectly constructed and insufficiently equipped. This 12 miles had been constructed by a construction company which itself became insolvent, and could proceed no further with its contract. The bill further alleged that it was first operated in 1889, and after 1892 had been operated by the receiver appointed by the court until the sale thereof in July, 1896, when it ceased to be operated; that during all that time it had not paid operating expenses, and not a dollar had been paid on account of interest or receivers' certificates; that the roadbed had sunk, the bridges were out of repair, and that to put the road in repair to make it safe to operate would cost at least $10,000; that it would be financially ruinous for the then owners to attempt to run the road; that the owners had exerted themselves to promote a scheme by which the small portion of the road which had been built could be operated, but had not succeeded; that the citizens along the line had been in vain appealed to for assistance, and that while the road was operated they to a large extent refused to patronize it, and hauled their produce and merchandise by wagons to Greenville. It was a fact appearing in the subsequent proceeding that in the effort made by the receiver in the original case to successfully operate the road, the court had authorized him to borrow $12,500 on receiver's certificates, which had been spent in constructing 3 miles of additional track to reach the town of Marietta, which construction extended the track from 12 miles to 15 miles. The bill of complaint of Jack further alleged that the Legislature of

South Carolina had passed an act, approved March 5, 1897, requiring all owners of railroads to reorganize, under section 1610 of the Revised Statutes of South Carolina, within 60 days after the passage of the act, under a penalty of $50 per day for failure to do so. The bill alleged that it would be utterly useless for the owners of said railroad to attempt to comply with said act, and yet if they refused to do so they might be subjected to the penalty imposed by said act. The prayer of the bill was that the defendants Williams and Beattie be enjoined from taking any steps to become incorporated under the above-mentioned South Carolina law, that a receiver be appointed to take possession of said property, and to sell the same for purpose of partition among the parties owning the same, in such manner as the court might direct. The Circuit Court appointed Mr. W. C. Cothran receiver, as prayed. The receiver obtained the services of a skilled railroad expert to report to the court the then condition of the 15 miles of road, and he reported that the trestles and roadway were in very bad condition, the track in a great many places covered with earth, in some places for a distance of 100 yards to the depth of two feet, and that it would cost $10,907.50 to put it in a condition to be operated for one year. The court in a decretal order entered May 18, 1897, recited the disastrous history of the road, and that it had been demonstrated that if then repaired and put and maintained in proper condition for operation it could only be operated at a positive loss. That in the suit in which the former receiver was appointed and in which the foreclosure decree of sale was entered the property was three times offered at public sale as a railroad without receiving what was then considered an adequate bid, and was finally sold at the fourth public sale to the holders of the receiver's certificates at the sum of $15,000, which was not sufficient to pay the debts incurred by the receiver. That as a railroad it was absolutely worthless, and that its rights, privileges, and franchises to maintain and operate the railroad had been forfeited.

In view of the worthless character and condition of the property as a railroad, and the futility of any attempt to operate it as a railroad, the court directed the receiver to remove the iron rails and fastenings from the roadbed, and to sell them, together with the rolling stock. The property so removed was sold as directed by said order of the court, and the proceeds after deducting expenses were distributed to the owners. There were certain other provisions having reference to the possibility of the state of South Carolina chartering another corporation for the purpose of exercising the franchises of the Carolina, Knoxville & Western Railway Company, in which case, as the court held, the present owners would be entitled to be paid the value of the rails, etc., removed, and the new corporation would be damaged only to the extent of relaying the rails, and the court directed $2,000 to be retained by the receiver to answer any such damage. No such new corporation was ever created, and the said provision has never become operative. Thereafter, on December 29, 1900, the state of South Carolina, with the consent of the Attorney General of the state, at and by the relation of T. B. Cunningham and others, by

leave of the court filed its cross-bill against Jack, Williams, and Beat-tie and the Charleston & Western Carolina Railway Company. The cross-bill recited the various acts of assembly by which the Carolina, Knoxville & Western Railway Company was in 1887 made a corpora-tion and succeeded to the rights, privileges, and franchises of several prior corporations, and was empowered to construct a railroad from Knoxville, in Tennessee, to Greenville, in South Carolina, with a con-necting link to Augusta, in the state of Georgia, of which 12 miles had been constructed from Greenville to within 3 miles of Marietta, in Greenville county. The cross-bill further recited the prior proceed-ings in the case in the United States Circuit Court in which the cross-bill was filed. It is alleged that the receiver had sold and transferred to the defendant the Charleston & Western Carolina Railway Com-pany all the rails and personal property mentioned in the proceedings for $28,000, and the said money was paid by the purchaser after notice that the complainant in the cross-bill had applied to the court for leave to file their cross-bill. The cross-bill then alleges that the said railroad could have been profitably operated at the time when said Williams ceased to operate it, and at the time when said Jack filed his bill of complaint alleging the contrary, and could be profitably operated at the time of filing said cross-bill, and that the failure to operate the same as a public highway under the laws of South Caro-lina, and the consequent depreciation of the property, was due to the unwillingness of the purchasers, Jack, Williams, and Beattie, to incur any expense or risk in the operation thereof, and to their preference to receive a profit by destroying the same as a public highway by dis-mantling the same. That by an act of the General Assembly of South Carolina approved February 17, 1900, the franchises purchased by Jack, Williams, and Beattie were specifically preserved and secured to the purchasers thereof, and that there was now no obstacle in the way of operating said road, even if such difficulty had ever existed, and that it was now the duty of the defendants, Jack, Williams, and Beattie and the Charleston & Western Carolina Railway Company, to forthwith organize a company under the laws of the said state, and to operate the said railroad as required by the laws thereof. The prayer was that the said defendants be required to restore to the road-bed the rails and other property taken therefrom, or to pay into the registry of the court the money received from the sale thereof, and such further sums as might be necessary to restore similar rails to said roadbed, to repair the damage done the cross-ties, trestles, and roadbed caused by the removal of the rails, and that the said de-fendants be required to operate the said road as required by the laws of said state for the carriage of freight and passengers in the same manner as before the sale to the original purchasers, or, in case the court should find that they were unable to do so, then that they be required to offer the same in its entirety as a public highway, and in default that the court should order that the sale and all previous orders appointing the receiver be set aside.

The answer of the defendants Jack, Williams, and Beattie denied that the railroad was anything more than an incomplete fragment of

the railroad designed and chartered to be built. They denied that the relators were dependent on the railroad for transportation of either goods or passengers. They averred in their answer that they had purchased the road after it had been offered at public sale four times without a bidder, except the $15,000 bid by the defendant Williams, and that after their purchase they ceased to operate it because it had been demonstrated that this fragment of roadbed only 15 miles long, could not pay expenses of operation, and that to operate it would have subjected them to ruinous loss of money, with no possibility of remuneration, and that neither the relators nor any other people had ever given them any encouragement or assistance, although they had tried to interest people in the completion of the said railroad, but without any success. Testimony was taken and the matter of the cross-bill came on to be heard before the late Circuit Judge Simonton. After painstaking consideration of the case, and for the reasons stated in a lengthy opinion filed in the case (113 Fed. 823), that learned judge held that at the time the road was dismantled it had been demonstrated that the 15 miles of road was worthless as a railroad, and could not be operated except at a loss, and that the franchise was forfeited; that under the circumstances the purchasers of the property were entitled to make the only use of what they had purchased which was possible, which was to remove and sell the iron. The court entered a decree dismissing the cross-bill, and from that decree this appeal was taken.

The contention of the appellants is that the dismantling of the road was a violation of the right of the state of South Carolina in a highway established by its authority; that the corporation having exercised the powers given to it by the state to enable it to construct the highway, no one could have the right thereafter, without notice to the state and permission obtained, to abandon the enterprise, and take away the removable property.

There are many circumstances peculiar to this case. They appear in the testimony and in the pleadings, and are carefully set out in the opinions filed in the case below. In the first place, the existing structure was not the railroad chartered by the state. That railroad was one extending from Greenville, S. C., to Knoxville, Tenn. In 1887 a contract was made with a construction company for the building of that line. Only 12 miles from Greenville had been built when the whole scheme collapsed in consequence of the decision of the Supreme Court of South Carolina that the townships along the line could not lawfully issue bonds to aid in building the road. Without that assistance it was hopeless to attempt to finance it. It was attempted to operate this small fragment of 12 miles, with the result that it was very soon in the hands of the receiver. Then, for the reason that the 12 miles ended in the woods, an effort was made to save it from abandonment by borrowing $12,500 on receiver's certificates with which to build 3 miles more to reach the town of Marietta. The receiver, by authority from the court, borrowed the money, and built the three additional miles, and managed to run the road for four years, giving it his personal attention, without charging anything for his services, paying

no interest, and not repaying the borrowed money. Having no money to spend in repair or betterments, at the end of the four years, for want of money spent to keep it up, the road was in a deplorable condition, and too dangerous to run. Its operation had to be discontinued, and it had to be sold for whatever it would bring. After offering it three times at public auction without any bid, at the fourth sale Williams, representing the holders of the receiver's certificates, in order to try and save something from the wreck, bought it at $15,-000, and became the owner. This fragment of a proposed railroad was not built by the state, but by a corporation chartered for that purpose, authorized to incur debts and to mortgage its property, including its railroad. Nothing was contributed in any way by the interveners towards its construction. When it did not pay its mortgage debts, the railroad, like other mortgaged property, could be sold, and no doubt, under ordinary circumstances, the purchaser would be obliged to maintain the highway for the purpose to which it was devoted by the charter under which it was constructed. But when by actual experiments, continually made for four years by an officer of the court, it was demonstrated that as a railroad the highway had no value, and could not be operated except at a steady loss, and could not be sold except at a price less than the cost of the rails, and these facts were established by judicial finding, can it be said that the owner was to be compelled either to operate the road at a ruinous loss or to walk away and abandon even the iron rails? The contention of the appellants does not go to this extent, and it must be conceded that if, with respect to an incomplete fragment of a highway such as this, sufficient public notice had been given that the part built had proven unprofitable and was about to be sold as an abandoned undertaking, and nothing was done by those desiring the continuance of the railroad to render its continuance possible, then a decree affording the equitable relief granted in the original decree for dismantling the railroad might be justifiable. In this case there was great publicity as to the condition of the 15 miles of track. The failure of the original enterprise was notorious and the cause of it. The appointment of a receiver, and the running of a road under his management for four years, the building of the three miles of additional track under the court's order, were all matters of public notoriety. Thereafter there were the four advertisements of public sales, and the cessation of the operations of the road for nearly three years, and finally the removal of the rails and their sale. During this time nothing was done by any one interested in the continuance of the road to relieve the embarrassing situation of the unfortunate persons who had advanced money on the receiver's certificates.

As adverted to by the circuit judge, the power given by the charter was in terms permissive to build the railroad, and not mandatory to maintain it. When the condition is such as existed when the 15 miles of the rails were removed, it has been held that the owners of the road cannot be compelled to reconstruct and maintain it when it would not be remunerative. Northern Pacific R. R. v. Dustin, 142 U. S. 492–499, 12 Sup. Ct. 283, 35 L. Ed. 1092. The fact that the road does not pay the

expenses of running the trains is persuasive evidence that the service to the public does not require it to be kept in operation. Morawetz on Private Corporations, § 1119. When, as authorized by the decree of the Circuit Court, the dismantling was in progress, the relator, T. B. Cunningham, and others, with the consent of the Attorney General of South Carolina, filed their petition on March 27, 1899, asking that the receiver be restrained from further proceeding to dismantle the road. The court granted the prayer of their petition for an injunction; the order to become operative when the petitioners should file a bond with sureties in the penalty of $5,000 for the payments of the damages caused by the injunction. This bond was not given, and the injunction did not become operative.

The complainants in the cross-bill have procured offers of several persons who are willing to undertake to run the road and pay a rental of from $1,500 to $1,800 a year, provided the rails are put back, and the road restored to the same condition it was when the rails were removed. Doubtless, the general conditions of prosperity have improved since the date of the decree authorizing the removal of the rails, and if the question were now before the court possibly some one could be found who would undertake to repair and operate the road; but it was not so at the date of that decree. The proofs show that in 1899, when the rails were removed, the whole physical condition of the railroad was ruinous, and not safe to run; that to make it safe for one year would require $10,000. Naturally the deterioration of the ties, bridges, and roadbed had gone on, and to put the structures in the same condition they were in when the rails were removed would have required much greater outlay.

The prayer of the cross-bill is that the defendants be required to restore the rails to the roadbed, to repair the damages to the cross-ties, trestles, and roadbed caused by the removal, and that the defendants be required to operate the road, or to be required to offer the same for sale as an entirety as a public highway. As is so fully set forth in the opinion of the court below, this would be to require of the defendants to rebuild the road at a great expenditure, for which they would receive no return, even if it were now possible in the present more prosperous times to obtain sufficient revenue to operate this small fragment of road.

The opinion of the late Judge Simonton in the court below carefully recites all the facts connected with the attempts to operate the road, he having appointed the first receiver and being familiar with its history, and it seems to us unnecessary to further add to his convincing statement of the grounds upon which the cross-bill was dismissed.

Decree affirmed.