### NEW YORK TRUST CO. v. PORTSMOUTH & EXETER ST. RY. CO.

(Circuit Court, D. New Hampshire. December 11, 1911.)

#### No. 374.

1. COURTS (§ 489*)—CONCURRENT JURISDICTION—STATE AND FEDERAL COURTS.
   Where there is diverse citizenship, a federal court had the same authority and the same duty to dispose of the assets of an insolvent street railway that the state courts would have.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1324–1341; Dec. Dig. § 489.*

   Conflict of jurisdiction with state courts, see note to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.]

2. STREET RAILROADS (§ 55*)—FORECLOSURE OF MORTGAGE—SALE OF PROPERTY.
   A court of equity having possession of the res, with the parties before it, including the proper representative of the state, has the power, in a suit to foreclose a mortgage upon the property of a hopelessly insolvent street railway company, to dispose of the property involved in any reasonable way which may be for the best interests of the mortgagee, and, if necessary, to order sale in the alternative.
   [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 134; Dec. Dig. § 55.*]

In Equity. Bill by the New York Trust Company against the Portsmouth & Exeter Street Railway Company to foreclose a mortgage. Motion for the entry of a decree of foreclosure and sale granted.

Samuel W. Emery, for complainant.

G. K. Bartlett, for defendant.

E. G. Eastman, Atty. Gen., for state of New Hampshire.

ALDRICH, District Judge. We have now to consider the motion of the complainant for the entry of a decree of foreclosure and sale under a mortgage. The property covered by the mortgage is the Portsmouth & Exeter Street Railway, which runs from Portsmouth to Exeter in the state of New Hampshire, and is located within the limits of highways.

This railway company was incorporated by a special act of the New Hampshire Legislature, approved March 7, 1901. The road originally cost something like $300,000, and the expense of construc-

tion was met through issuing bonds and the sale of stock. The road has been operated at a serious loss from the beginning, and as indicated by the report of the masters, if interest is considered and the property is disposed of under the most favorable conditions, the loss to the stockholders and bondholders will be equal to the entire amount of the stock and bonds. Thus it would result that the loss would be something like $300,000.

The original suit was for the foreclosure of a mortgage held by the New York Trust Company covering an indebtedness, March 4, 1911, of about $170,000, and in the due course of its pendency a receiver was appointed to operate the road experimentally. It having been ascertained that there was no probable or possible way of operating the road without serious loss, an application was made for leave to sell. The application is based upon the idea that it may become necessary, in order to realize anything under the mortgage, to sell under such circumstances as will permit the purchaser to dismantle the road as a railway, and dispose of the property as junk at an upset price.

The proposition for leave to dismantle a railway chartered by the Legislature and operated under the laws of a state which declare that all railroads are public and that the proprietors thereof shall not discontinue them or any part of them suggests at once an important and delicate question, a question which would ordinarily be deemed to be a legislative question. Acting upon the view that the statutes of New Hampshire in this respect direct themselves against the proprietors of a railroad as a prohibition upon voluntary discontinuances and surrenders, and upon the idea that there must be authority in a court dealing with a situation as one, practically, of total insolvency, a board of masters consisting of three prominent citizens of the state was appointed to hear the parties and to examine into the affairs of the railway company, and report as to its financial status and possibilities as a going concern.

The report, which is affirmed, shows that the road is in the situation which has been explained; that the roadbed, rails, rolling stock, and other equipments are out of repair, and to render the road safe to operate large expenditures would be at once required; and that the franchise of the road is valueless.

[1, 2] This being a case in which there is diverse citizenship, it is assumed that the federal court has the same authority and the same duty to deal with the situation that the state courts would have, if the question and the right were before them. The state of New Hampshire is represented in this proceeding by the Attorney General, who has submitted a brief. The conclusion reached is that a court of equity, having possession of the res, with the parties before it, including the Attorney General, the proper representative of the state, has the power in an insolvent situation like this, to dispose of the property involved in any reasonable way which may be for the best interests of the mortgagee, and if necessary, as seems to be the case here, in order to realize anything from the property to order a sale in the alternative.

The authorities upon this question are not numerous, but such cases .as Jack v. Williams (C. C.) 113 Fed. 823, and the same case in 145 Fed. 281, 76 C. C. A. 165, and Ralston v. Dodge City, etc., Railroad, 53 Kan. 329, 36 Pac. 755, 24 L. R. A. 564, indicate that courts refuse to issue mandates to compel the operation of railroads which are totally insolvent; and where there is no possibility that conditions will be improved by continuing the road as a going concern.

Some of the decisions base the refusal to compel owners to operate under circumstances of great pecuniary loss, which must result through repairs and continuance as a going concern, upon the ground that it would deprive the owners of their property without compensation, and therefore that it is justifiable to order a receiver to dismantle the road and sell the materials.

Other cases suggest the idea that the public interest is somewhat involved, but perhaps the better view would be that the public interest is one of the principal questions to be considered. Under this view, it will become necessary that the plan of sale must be so arranged as to first enable the public, or members of the public, to buy the road, as a going concern, at a sum considerably less than an upset price based upon the value of the material sold under such authority and conditions as will permit the road to be dismantled.

· The masters having found the junk value to be approximately $53,-000, an upset price will be fixed upon motion, without further hearing or evidence, upon the facts already appearing, including those found by the masters.

Counsel for the petitioner will prepare a draft order of sale in accordance with the views expressed in this opinion.

I think it is too late for the state to raise the question of the validity of the bonded indebtedness, even if such question could be tried in the collateral way in which the question is suggested.