## Southern Railway Company in Kentucky v. Hatchett, et al.

(Decided March 9, 1917.)

### Appeal from Mercer Circuit Court.

1.   Railroads — Operation — Service — Statute. — In determining the length of a branch railroad required to be operated daily by subsection 1 of section 772a of the Kentucky Statutes, the character

of the train service which the company furnishes over the branch road should be considered; and if it be more than five miles long as operated, it may be within the statute although the branch track itself is less than five miles in length.

2. Railroads—Operation.—Railroads are creatures of the law invested with certain powers to promote the public interest, for which reason they may be required to conduct their affairs in furtherance of the public objects of their creation.

3. Railroads—Regulation—Regulation of Police Character.—A state which charters a railroad corporation may make all needful regulations of a police character for the government of the corporation while operating its road in that jurisdiction.

4. Railroads—Change in Location.—After a railroad has been located and actually constructed, no change of location can be made without legislative authority.

5. Railroads—Location—Change of Location.—The extent and the purpose for which the location of a railroad may be changed are fixed by subsection 4 of section 768 of the Kentucky Statutes, which also provides that the location of a railroad "shall not, except as otherwise provided, depart from the general route prescribed in the articles of incorporation."

6. Railroads—Operation—Abandonment of Part of Road.—A solvent railroad company cannot abandon a portion of its road merely because the operation of such portion is unremunerative; but must operate its line as a whole.

7. Railroads—Abandonment of Part of Road—A solvent railroad company cannot abandon an unprofitable portion of its road, under any state of case, except with the consent of the Commonwealth.

E. H. GAITHER, HUMPHREY, MIDDLETON & HUMPHREY and HORACE L. WALKER for appellant.

T. L. EDELEN, J. F. VANARSDALE and C. E. RANKIN for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

In this action by W. B. Hatchett, the Burgin Commercial Club, and certain citizens of Burgin, Mercer county, to enjoin the Southern Railway Company in Kentucky from discontinuing the operation of that portion of its road between Harrodsburg and Burgin, known as the Burgin branch, the circuit court granted the injunction. The railway company appeals.

Burgin is situated on the Cincinnati, New Orleans & Texas Pacific Railroad (formerly the Cincinnati Southern Railroad), 5.36 miles east of Harrodsburg. Formerly, Vercamp was a small station on the railroad about one mile south of Burgin.

In 1876, the citizens of Harrodsburg constructed and subsequently operated a railroad from Harrodsburg to

Vercamp.    This road was known as the Southwestern Railroad.

By an Act approved March 15, 1886, Mercer county was authorized to subscribe to the capital stock of the Louisville Southern Railroad Company, which was building a railroad from Louisville to Harrodsburg, and to pay therefor by issuing its negotiable coupon bonds, to run not more than thirty years, and bearing interest at a rate not exceeding six per cent.    The Act of 1886 further provided that the bonds of the county should not become a valid obligation until the railroad had been so completed through Mercer county that a train should have passed over the road; and, upon the establishment of that fact, the county was authorized to issue the bonds and receive the stock.    And, it was further provided that the subscription should not be binding upon the county unless the railroad should pass to or through the corporate limits of the town of Harrodsburg.

An election was held which authorized the county to make a subscription of $125,000.00, and the Louisville Southern Railroad was completed from Louisville to Harrodsburg.

The Louisville Southern Railroad Company thereupon acquired, by purchase, the Southwestern Railroad, above referred to, which had been constructed by the citizens of Mercer county in 1876 between Harrodsburg and Vercamp.

When the Louisville Southern Railroad Company bought the Southwestern Railroad, it extended the track from Vercamp to Burgin, a distance of little more than a mile; and, Burgin became and continued to remain the eastern terminus of the Louisville Southern Railroad so long as that system existed.

By this purchase the Louisville Southern Railroad Company extended its line from Harrodsburg to Burgin; and, claiming that it had complied with the Act of 1886 under which the county subscription had been made, by constructing its road through Mercer county, it demanded of the county its bonds in payment of the county's subscription.

But, as Burgin was a few miles west of the eastern line of Mercer county, the county refused to accept the completion of the road to Burgin as a compliance with the Act of 1886 which required the railroad company to complete its road through Mercer county.    After a protracted litigation in the federal courts, it was finally held

that the Louisville Southern Railroad Company had complied substantially with the condition precedent to the issuance of the bonds, by building its road to Burgin, which was located upon the Cincinnati Southern Railroad, thus affording the citizens of the county as complete railroad facilities as they could have had if the railroad had been extended east of the Cincinnati Southern Railroad. See 72 Fed., 623, and 170 U. S., 593. The county bonds were thereupon delivered and the railroad company received the benefit of them.

While this litigation was pending, and before the trustee had delivered the bonds, and while the discussion was going on as to whether the selection of Burgin as the eastern terminus was a compliance with the condition upon which the bonds were to be issued and the subscription completed, the Louisville Southern Railroad Company prepared to extend its road towards and to the city of Danville, in Boyle county; and, with one exception, had acquired all of the rights of way to the southern line of Mercer county. Provident Life & Trust Co. v. Mercer County, 170 U. S., 593.

But nothing further was done by the Louisville Southern Railroad Company towards extending the line to Danville.

In 1894, however, the appellant, the Southern Railway Company in Kentucky, a Kentucky corporation, bought the Louisville Southern Railroad, and has continued to the present time to operate the road from Louisville through Harrodsburg to Burgin.

In 1906, the Southern Railway Company extended its track from Harrodsburg southwardly 7.9 miles to Danville, leaving the old track between Harrodsburg and Burgin at a point 1.3 miles east of Harrodsburg, which, for purposes of identification, is called the "junction." There is at this junction, however, nothing more than a switch; it is not a station at which trains stop, except for the purpose of throwing the switch, when necessary.

Since 1906, the through trains of the Southern Railway have gone from Louisville through Lawrenceburg to Harrodsburg, and from Harrodsburg direct to Danville; the road from Harrodsburg to Burgin being operated as a branch road. About 1913, the track of the old Southwestern Railroad between Harrodsburg and Burgin was taken up and a new track was built by the appellant between those points. The accompanying plat will illustrate the situation as it now exists.

It will be noticed that the distance from Harrodsburg along the main line to Burgin junction is 1.3 miles; that the distance from Burgin junction to Burgin is 4.6 miles; and from Burgin junction to Danville 7.9 miles.

Sub-section 1 of section 772a of the Kentucky Statutes, reads as follows:

"That all corporations, companies, persons or associations owning and operating a railroad line in this Commonwealth or any branch of any railroad in this Commonwealth, the length of which exceeds five miles, shall be required, and they are hereby directed, to run at least one passenger train each way on every day of the year, Sundays excepted, over said line: *Provided,* however, that the operation of a train known as a mixed train on lines carrying passengers and freight for hire, on which both passengers and freight are carried, if operated in accordance with the provisions of this act, shall be deemed a compliance therewith. *Provided,* further, that the provisions of this act shall not apply to mere coal switches or any switch or branch, which is chartered and used by any corporation, company or person merely for the purpose of carrying freight or coals to their main line or track."

The further provisions of this statute relate to penalties for its violation.

The questions presented in the argument are two; (1) whether the length of what is called the Burgin branch is to be measured from Burgin to Burgin junction, or from Burgin to Harrodsburg, this latter method being necessary in order for us to deal with a road five miles long and thus bring the case within the provisions of the statute, above quoted; and, (2) whether a railroad company can be compelled to operate a branch line at a loss, when there is practically no public demand therefor.

Appellant frankly admits that it purposes to abandon the operation of the road between Burgin and Burgin junction, and to remove the rails and cross-ties, unless it be restrained from doing so.

Counsel for the appellees devote little or no portion of their argument to the first proposition, evidently preferring to rest their case largely, if not entirely, upon the second proposition; but, as counsel for appellant earnestly present the first proposition, above stated, and seek a decision of that question, we will pass upon it.

1. It is earnestly insisted by appellant that in applying the statute, *supra,* to the facts of this case, we must treat that portion of the road between the junction and Burgin as a branch of appellant's main line, and that it must be treated as if it were so operated between those two points, which are less than five miles apart.

Waiving the question as to whether a railroad company can make a portion of its original line a branch by

giving it that name, we do not think the branch should be measured between the junction and Burgin, for the reason that no trains make the junction the ending point of their journey. The trains that run over this branch road, run between Harrodsburg to Burgin; they do not run from Burgin junction to Burgin, except as a part of the journey from Harrodsburg to Burgin. It is true that a train going from Harrodsburg to Burgin passes over the main line from Harrodsburg to the junction, a distance of 1.3 miles; but it is nevertheless true that in making the trip from Harrodsburg to Burgin, the fact that there is a switch at the junction in no way affects the character of the trip, or the fact that the train goes from Harrodsburg to Burgin, a distance of more than five miles. In other words, in determining what constitutes the branch road under operation, we should consider the character of the train service which the company furnishes over the branch road. All of appellant's southbound trains, whether they go to Burgin or to Danville, pass through Harrodsburg and over the main line to the junction; some of them turning to the left to Burgin, the others turning to the right to Danville. But, in each instance, the run going eastwardly must be treated as having started at Harrodsburg, since there is no stop or station between Harrodsburg and the junction or at the junction, except, possibly, for switching purposes. A passenger cannot go by train from Burgin to the junction since the company sells no tickets and makes no provision for the transfer of passengers or freight, at the junction. On the contrary, a passenger from Burgin to the junction is required to continue his trip to Harrodsburg, where he must change cars for Louisville and for the southern points.

We conclude, therefore, that the case comes within the provisions of section 772a of the Kentucky Statutes, above quoted,

2. Can a railroad company be compelled to operate a portion of its line at a loss?

Counsel for appellant raise this question, contending that the real question here is: Can a railroad be compelled to operate a branch line at a loss, when there is practically no public demand therefor? We do not think, however, that the modification of the question can change the decision, since we have reached the conclusion that the right of a solvent railroad company to abandon an unprofitable portion of its road, under any state of case,

can be exercised only with the consent of the authority that created it.

It is shown by appellant that this branch road between Harrodsburg and Burgin is operated at a loss approximating $2,500.00 or more per year, exclusive of the cost of maintenance.

On the other hand, .the appellees insist that if this line between Harrodsburg and Burgin is discontinued, the residents of that portion of Mercer county east of Harrodsburg, and which is now served by this particular portion of the Southern Railway system as an outlet to the Louisville market, will be compelled either to limit their shipments to the Cincinnati market over the C. N. O. & T. P. Ry. Co. by stopping at Burgin, or they will be compelled to drive their stock five miles further to Harrodsburg and there load it upon cars for the Louisville market. Under the situation as it now exists, these residents of the eastern portion of Mercer county have competing markets, in Louisville and Cincinnati; but, it is claimed that a discontinuation of this line would deprive them of the Louisville market as a practical proposition, since it would be impracticable to drive hogs, cattle and sheep this additional distance between Burgin and Harrodsburg. And, by way of answer to appellant's contention that the Burgin branch has, for more than two years, been operated at a loss, appellees insist that the appellant brought about this state of affairs by rendering a merely nominal service on the Burgin branch, during that time, without any effort to meet the trains of the C. N. O. & T. P. Ry. Co. at Burgin. It does not appear to have been unprofitable when the train service was good.

We do not attach much importance to the answer of appellant that the shippers at Burgin can ship by the way of Danville over the C. N. O. & T. P. road and thence over the Southern to Louisville, since the purpose of this action is to avoid that unquestioned inconvenience arising from having to go a roundabout way, and waiting upon the conflicting time tables of the two roads. If the appellees have the right to require the appellant to operate the road between Burgin and Harrodsburg, it is no answer to tell them they can travel by some other route.

In this connection one of the appellant's officials admitted upon cross-examination that no attempt was made to run regular trains on the branch, and that the trains running from Harrodsburg to Burgin were without a

regular schedule, and would frequently pass a given point from one to twelve hours later than they passed the same point the day before.

Under this character of service, it would hardly be reasonable to expect a manifest public demand or necessity for the operation of this branch road; and, it does not appear that there was such a decided lack of interest in the road on the part of the public, when the service was adequate.

In support of its right to abandon the road between Burgin and the junction, appellant relies upon Commonwealth v. Fitchburg R. R. Co., 12 Gray 180; Sherwood v. Atlantic & D. R. Co., 94 Va. 291; Jack v. Williams, 113 Fed. 287 (affirmed in 145 Fed. 281); O. & M. Ry. Co. v. People, 120 Ills. 200; Northern Pacific R. R. Co. v. Dustin, 142 U. S. 493, and State of Iowa v. Old Colony Trust Co., 215 Fed. 357, L. R. A. 1915A, 549.

We have examined each of these cases carefully, and fail to find that they support the broad proposition contended for by appellant.

The relation of a railroad to the public was stated in a general way by this court in Commonwealth v. L. & N. R. R. Co., 120 Ky. 104, to be as follows:

"The railroads are creatures of the law, invested with certain powers to promote the public interest, for which reason they may be required to conduct their affairs in furtherance of the public objects of their creation; and, it is because of this public character that courts assume jurisdiction to enforce the public duties required of them."

And, in the course of the opinion just quoted from, this court approved the following language taken from the opinion in Gladson v. State of Minnesota, 166 U. S. 429:

"The principles of law which govern this case are familiar, and have often been affirmed by this court. A railroad corporation created by a state is for all purposes of local government a domestic corporation, and its railroad within the state is a matter of domestic concern, even when its road connects, as most railroads do, with railroads in other states; and the state which created the corporation may make all needful regulations of a police character for the government of the corporation while operating its road in that jurisdiction. It may prescribe the location and the plans of construction of the road, the rate of speed at which trains shall

run, and the places at which they shall stop, and may make any other reasonable regulation for their management in order to secure the objects of the corporation, and the safety, good order, convenience, and comfort of the passengers and of the public. All such regulations are strictly within the police power of the state."

See also Lake Shore & M. S. Ry. Co. v. State of Ohio, 173 U. S. 285.

While some of the cases relied upon by appellant do, in general terms, announce the doctrine that no railroad corporation will be compelled to operate its trains at a loss, a careful reading of the cases upon the subject will show that the modern general rule is, that a company cannot legally abandon its road or a branch, even though it may be operated at a loss, and, those cases which are apparently in conflict with this rule will be found to have turned upon special circumstances that warranted the decision.

The old case of Commonwealth v. Fitchburg R. R. Co., 12 Gray 180, was decided nearly sixty years ago in the infancy of railroads, and puts stress upon the fact that no statute had imposed the duty upon the company; and a careful reading of the opinion clearly shows that it is not in harmony with later decisions.

The decision in Sherwood v. Atlantic & Danville R. R. Co., 94 Va. 291, chiefly relied upon by appellant, was largely, if not entirely, rested upon the ground that the continued operation of the branch road would permanently cripple the entire road. In that case, after determining that the company had fulfilled all of its charter obligations, the court said:

"The idea, however, seems to be entertained that though it was not a duty to construct this branch road, yet that, having been constructed, it becomes the duty to maintain and operate it, regardless of all consequences; while, on behalf of the company, the contention is that, having fairly tested the advantages and disadvantages of operating the branch line from Shoulders Hill into the city of Portsmouth, the determination had been reached to abandon it because its maintenance involved the cost of keeping two terminals at an outlay wholly incommensurate with the benefits conferred, and the demands of traffic to be accommodated by it; that the business of the road did not justify such an expenditure; *and to continue it would put in jeopardy the existence of the road, and might disable it to perform its*

*duties as a carrier of freight and passengers on other portions of its line,* and that the provision made for the accommodation of the passengers and freight received from and taken to the city of Portsmouth was, under the conditions and circumstances, reasonably sufficient. The evidence strongly tends to maintain these positions of the respondent.''

Again, on page 306, the court further said:

"Where the line of a railway, *taken as a whole,* cannot be profitably maintained; where its operation when discretely and economically managed, is attended with loss, it is difficult to see how a court can, by mandamus or otherwise, compel its operation to be continued.''

It will thus be seen that the court in that opinion laid stress upon the fact that to require the road to reinstate and operate a discontinued branch at a loss, might disable the company to such an extent that it would be unable to operate trains upon other portions of its line; that in considering the question of the propriety of the courts requiring a railroad company to operate its trains over a certain portion of its line, we must consider the line of railway, "taken as a whole;" and if, when so taken, it could not be profitably maintained or operated, the court would not grant a writ of mandamus requiring it to do so.

Furthermore, in the subsequent case of Southern Railway Company v. Franklin & P. R. R. Co., 96 Va. 693, 44 L. R. A. 301, the Virginia Supreme Court of Appeals, distinguished the Sherwood case, in the following language:

"Our conclusion is that the obligation to maintain and operate the road during the term of the lease is a necessary implication from its expressed stipulations. It adds nothing to the written contract to infer an obligation to do what was actually intended by the parties and what is essential to give effect and vitality to it.

"This conclusion is in no wise inconsistent with the case of Sherwood v. Atlantic & D. R. Co., 94 Va. 291, where this court refused to compel the railroad company to replace its tracks from its existing terminus to its former terminal station, in the city of Portsmouth, and to re-establish that point as the terminal station of its line. That case, which was much relied upon by counsel for the appellant, furnishes no ground for the contention

that the appellant may abandon, at its will, the use of the appellee's road. . . . .

"In Sherwood v. Atlantic & D. R. Co., 94 Va. 291, the distinction was clearly drawn between the positive duties imposed by charter and those assumed by a corporation under permissive grants of power. As to the former, it was said that the court would compel their performance by appropriate remedies, while with respect to the latter it would enforce them or withhold its hands, as might seem just, upon a consideration of all the circumstances of the case.

"In the case at bar there is the obligation by contract upon the lessee to maintain and operate the leased road. The obligation is in full force, and as binding as if it were a positive duty imposed by charter. The case is clearly distinguishable in principle from that of Sherwood v. Atlantic & D. R. Co."

Likewise, in O. & M. Ry. Co. v. The People, *supra,* decided in 1887, while the court recognized the duty of the company to operate its trains, and that it could be made to do so in a proper case, it declined to require it to do so by *mandamus,* when the road was dangerously out of repair, and the company had no money or credit to raise funds necessary to pay for the repairs; and expressly holding that a proceeding in the nature of a *quo warranto* to forfeit its charter was the proper remedy.

In closing its opinion in that case, the Supreme Court of Illinois said:

"We are of opinion that upon the admitted facts of this case the company is clearly guilty of a violation of its duty in not keeping its road in a proper state of repair and a safe condition, but that, under the circumstances and for the reasons heretofore stated, *mandamus* is not the proper remedy for the enforcement of such duty. If, as seems to be the case, the defendant *is wholly unable to discharge the duties it owes to the public,* and which the law has imposed upon it, a proceeding in the nature of a *quo warranto* is the proper remedy, and not mandamus. . . . .

"If the line of road is not capable, under any management, of being made self-sustaining, it simply shows there is no demand or necessity for the road and the sooner, therefore, the state revokes the franchise, the better."

Upon an analysis of this opinion, it will be seen that the court rested its opinion upon two important and controlling facts: (1) that the road was dangerously out of repair; and, (2) the company was without funds or credit to repair it, and consequently that the proceedings in a case of this character should be by *quo warranto* and not by *mandamus*.

For the same reason—that of the inability of the company to raise funds—a mandamus to compel a railroad company to replace and repair its track was refused in State v. D. C. M. & T. Ry. Co., 53 Kans. 329, 24 L. R. A. 564. New York Trust Co. v. Portsmouth & Exeter St. Ry. Co. (1911), 192 Fed. 320, and State of Iowa v. Old Colony Trust Co. (1914), 215 Fed. 307, L. R. A. 1915A 561, are to the same effect.

Jack v. Williams, *supra,* is, in its language, perhaps the strongest case cited by appellant in support of its contention. But, from an examination of the facts and the opinion of Circuit Judge Simonton in 113 Fed. 826, it will easily be discovered that the decision turned upon the special circumstances of that case, and really is in line with the cases last above cited, where the insolvency of the road, as a whole, made it improper, and indeed impossible, for the court to require a replacement of a removed track, and the operation of the road. The facts were these: A railroad had been built from Greenville, S. C., a distance of twelve miles toward Marietta, ending in the woods, when the company became bankrupt. A receiver appointed by the court built the road three miles further to Marietta, with money raised upon receiver's certificates. It was not a branch road that was involved; it was the entire road. The railroad company was hopelessly insolvent. It had paid no part of its bonded indebtedness, or any interest thereon; it had not even paid for its right-of-way. The road ran through a territory requiring many trestles, and these and the road bed itself were fast decaying, requiring immediate repair, their condition being so bad as to endanger life and property. Under these circumstances the creditors applied for a sale of the road; and, as no organization could be effected for its purchase, a sale was ordered at an upset price of $50,000.00. But there were no bidders, and another sale was ordered at an upset price of $30,000.00. Again there were no bidders; and, for a third time a sale was ordered, the upset price being lowered to $25,000.00. And, again there were no

bidders. Finally, for a fourth time, a sale was ordered at an upset price of $15,000.00, and the property was sold to Williams, for himself and Jack.

Williams did not operate the road at all; and the legislature of South Carolina having passed an act in 1897 requiring every owner of a railroad in the state to operate it, under penalty of a fine and forfeiture of the franchise, Williams and Jack, as the owners of the road, filed their bill in equity, asking the court, among other things, to direct a sale of the rails of the road, and a division of the proceeds among the different lienholders. The rails were sold for $28,000.00. Subsequently, certain neighbors and landowners intervened in the case, seeking to require the purchasers, several years after the road had been dismantled, to replace the same in its former condition in order that the road might be operated by others as a public highway. The court refused, under these exceptional circumstances, to require Williams to rebuild the road and to operate it, since the road, "as a whole" was dangerous; and, in order to place it in a condition to operate it, the owners would have been compelled to spend many thousands of dollars.

When it is analyzed, it will be seen that the decision in Jack v. Williams comes squarely within that class of cases which permit the abandonment of a road when the road "as a whole" is insolvent and without credit, and the operation of the abandoned road would impair the usefulness and perhaps the existence of the whole road.

This conclusion is unavoidable, in view of the fact that Judge Simonton, in support of his opinion, quoted from the syllabus in Kansas v. Dodge City, M. & T. R. Co., 24 L. R. A. 564, as follows:

"Where a railroad company owning a short line of railroad, 26 miles only, *is wholly insolvent,* and such company has no cars or engines with which to operate it, and no funds or property to be applied to the payment of expenses of the company or the road, and the road has been abandoned for several months, and the road can not be operated except at a great loss by any corporation or person, not taking into account the repairs of the road and the taxes thereon, the supreme court, having discretion in the granting of a writ of mandamus, will not compel, by a peremptory writ, the railway company to replace or put in repair its track,

a part of which has been torn up, as such an order would be futile and of no public benefit.''

That this is the meaning of Judge Simonton's opinion in the Jack case is clearly shown from the opinion in 145 Fed. 283, affirming Judge Simonton, where the Circuit Court of Appeals lays stress upon the fact that the railroad ''as a whole'' was absolutely worthless.

And, here it may be noted, that the courts make a distinction in cases of this character and frequently will enjoin the abandonment of a road, when they will not, by mandamus, compel a railroad company to relay, rebuild and operate a part of its road which had theretofore been abandoned.

This distinction was made plain in Brown v. Atlantic Ry. Co., 126 Ga. 257, 7 Am. & Eng. Ann. Cas. 1026, where the court said:

''A number of authorities cited on the part of the defendant in error are to the effect that if the charter of a railroad company simply authorizes it, without requiring it, to construct and maintain a railroad to a certain point, it cannot be compelled by *mandamus* to complete the road to that point or to operate a line or branch, or run trains of a certain character, or with certain schedules, at a loss. Without entering into a discussion of these various citations, it may be remarked that the facts in each are quite different from those now presented before us. The present case does not involve the application for a *mandamus* to compel a railroad to do some act of the character just indicated, or even to rebuild or restore a portion of a line that has been taken up. It is an application for injunction by persons who allege that they will be specially injured, to prevent a railroad company from tearing up its tracks, and abandoning a portion of its line of road already constructed, in order to run its trains over a different route. Probably the strongest case presented for the defendant in error is that of Jack v. Williams, 113 Fed. Rep. 823. It is there stated broadly that 'In the absence of special circumstances, or an express contract embodied in a charter, the owner of a railroad, whether a corporation or an individual, can not be compelled to maintain and operate the same at a loss. The duty arising from the ownership of the franchise is merely to meet the public requirements, and, where the traffic on a road is not sufficient to pay its operating expenses, such duty does

not require its operation, and it may be abandoned.' It appeared, however, that a short road twelve miles long had been dismantled by a receiver in charge of it, under order of the court. After a sale of it, by intervention it was sought to require the purchasers to rebuild and operate the road. Under a statute of South Carolina, passed after the purchase by private individuals, natural persons were not permitted to operate a railroad without organization into a corporation. It was said: 'The receiver having taken up and sold the rails under an order of court entered without opposition, the court could not require the owners to purchase new materials and rebuild the road, or an offer by intervenors to lease and operate the same if restored, especially in view of the fact that the franchise to operate it as as railroad had been forfeited.' There is a wide difference between an effort by *mandamus* to compel action of this character, and a proceeding by injunction to stop the tearing up of a railroad track. State v. Dodge City R. Co., 53 Kan. 377, 42 Am. St. Rep. 295; Gates v. Boston R. Co., 53 Conn. 333, 343.''

The remaining case of Northern Pacific R. R. Co. v. Dustin, 142 U. S. 493, decided in 1891, and relied upon by appellant, is hardly in point. That was an application to require the company, by mandamus, to erect and maintain a station at Yakima City, and stop its trains there, when there was no legal obligation upon the company to do so. It decides that a writ of *mandamus* to compel a railroad company to do a particular act in running its trains, can be issued only when there is a specific legal duty on its part to do that act; it is authority for nothing more. And, as there was no legal or other duty imposed upon the company to stop its trains at Yakima City, the writ of *mandamus* was properly denied.

Turning now to the authorities relied upon by the appellees to support the judgment of the chancellor, we find the primary general rule to be that after a railroad has been located and actually constructed, no material change can be made in its route or location, much less an abandonment thereof, without the consent of the state.

Thus, in 33 Cyc. p. 131, the rule is stated as follows:

''The authorities are practically uniform to the effect that after the road has been located and actually constructed no change can be made without legislative au-

thority, even where the object of the change of location is to straighten curves and reduce grades, and if made would be a benefit to the public; and while-there is some conflict as to the right to change the location after it has been selected but before the road is constructed, the better rule would seem to be that after a particular location has been definitely adopted the company cannot, without legislative authority, change it merely for motives of convenience, expediency, or economy, or to avoid an unsatisfactory assessment of damages; but that such changes may be made as are necessary to correct errors in engineering or to avoid obstacles which would defeat or interfere with a proper construction of the road, the railroad company being liable for the damages already actually sustained by land-owners by reason of the prior location.''

And, in a note to Brown v. Atlantic & Birmingham R. R. Co., in 7 Am. & Eng. Ann. Cas. 1032, the rule is stated in these words:

''It is well settled, in accordance with the ruling of the reported cases, that where the termini and general route of a railroad are prescribed by the charter of the company, the determination of details being left to the discretion of the company, the power of the company to fix the location of the road is exhausted after such discretion has been once exercised, and thereafter the location can not be changed without specific legislative authority.''

See also 23 Am. & Eng. Ency. of Law 690; Little Miami R. R. Co. v. Naylor, 2 Ohio St. 235, 59 Am. Dec. 667; State v. Mobile J. & K. C. Ry. Co., 86 Miss. 172, 122 Am. St. Rep. 277; Lusby v. K. C. M. & B. R. R. Co., 73 Miss. 360, 36 L. R. A. 510.

In a note to the Lusby case in 36 L. R. A. 510, the annotator says:

''With the exception of Mississippi & T. R. Co. v. Devaney, 42 Miss. 555, 2 Am. Rep. 608, which is now repudiated in Lusby v. Kansas M. & B. R. Co., the authorities are unanimous that in the absence of express statutory authority a railroad company can not relocate its railroad after it has been once constructed. The Devaney case held that railroad companies had the power to relocate the line of their roads after their completion under the first location, and to condemn for the purposes of such relocation private property if there is manifest necessity for the change and no detriment

thereby accrues to the public.  But the uniform current of case law is the other way."

And, it of course follows, that if a company cannot change the location of its road without the consent of the state, it cannot abandon it.  The only seeming exception to the rule (and it is really no exception) is in the case of a bankrupt road, where there is no one to operate it.

To a like effect see Northern Pacific R. R. Co. v. Doherty, 100 Wis. 39; Brownell v. Old Colony R. R. Co., 164 Mass. 29, 29 L. R. A. 169; McCoy v. C. I. & St. L. & C. R. Co., 13 Fed. 3, and the authorities cited in the note in L. R. A. 1915A 549, and Tulsa Ry. Co. v. State, 26 Okla. 559.

In Brown v. Janesville City Ry. Co. (1910), 4 Wis. R. R. Com. Rep. 757, the entire system of road was operated at a loss and the company had ceased operating a part of its track.  In a proceeding to compel the company to reinstate the discontinued service, the commission said:

"It seems to be well established that a railway company may not abandon a portion of its line merely because such operation is unremunerative, but must operate its line as a whole.  Nevertheless, if the entire road can not be operated, except at a loss, when economically managed, nothing can prevent the company from abandoning the enterprise and forfeiting its charter and franchise."

State v. Dodge City, Montezuma & Trinidad R. R. Co., 53 Kans. 377, 24 L. R. A. 564, 42 Am. St. Rep. 295, was an action to enjoin the company from tearing up and removing a portion of its track for the purpose of abandoning it.  The circuit court refused the injunction, and the state appealed.

While the court recognized the power to require a railroad company to perform its public duties specifically, in a proper case, by requiring the road to relay a track torn up in violation of its charter, it denied any relief under the peculiar facts of that case, which were very much like the facts in Jack v. Williams, *supra*. The Montezuma Railroad Co. was insolvent; it had no cars or engines; its line of road had not been operated for many months, and could not be operated except at great loss; and, the company had no funds or property which could be applied to the payment of operating expenses.

In denying the relief asked, the court said:

"The Block-Pollak Iron Company can not, under its conditional purchase of the superstructure, be compelled to repair or operate the road. There is no legal duty upon any of the other defendants to repair the road. Therefore, the question is, whether the court will compel, or attempt to compel, the railroad company—a bankrupt corporation—to relay the track and repair the road bed. The court will not make a useless or futile order. It will not do a vain thing. The order prayed for should only be issued in the interest of the public. If the track is replaced, there is no reasonable probability that the road will be or can be operated."

Again, in State of Iowa v. Old Colony Trust Co., 215 Fed. 307, L. R. A. 1915A 549, decided in 1914, the state appealed from an order of the United States District Court of Iowa directing the receivers of the defendant railroad to abandon and dismantle a portion of its line of railroad. In that case it appeared that the company was hopelessly insolvent and without credit, and that the revenues of the entire line of road did not justify the reconstruction and operation of that portion of it which it was proposed to abandon.

In affirming the judgment of the district court, the Circuit Court of Appeals said:

"A railroad corporation is, in an important sense, a public corporation. It is dependent upon the public for its franchises to exist and carry on business, and in consideration of these franchises it assumes and must perform certain duties and obligations for the benefit of the public. Among them, as a general rule, is the duty of maintaining its entire line of road in a reasonably safe and operative condition, and for a fair consideration to carry passengers and freight over it at all reasonable times, whenever requested to do so. These propositions are elemental and lay down a general rule which can not be gainsaid or denied. But there are some conditions which necessarily excuse full compliance with the requirements of these rules, and, in our opinion, the present case affords a striking example of such conditions. Here is a case where the line sought to be abandoned is not only not self-supporting, but its continued operation jeopards the successful operation of the entire system of which it is merely a part. Moreover, the continued operation in its present condition is dan-

gerous to life and property, and there is no money or financial ability to improve its condition. Not only so, but there is little public necessity for its continued operation, whereas there is a great public necessity for the continued operation of the balance of the system.

"In such circumstances the railroad company may abandon such an unprofitable and irreclaimable part of its road, and neither the state nor unfortunate investors along the line can justly complain. They cannot force a railroad company to do the impossible. Jack v. Williams (C. C.), 113 Fed. 823, id. 76 C. C. A. 165, 145 Fed. 281; Commonwealth v. Fitchburg R. Co., 12 Gray 180; People v. Albany & V. R. Co., 24 N. Y. 261, 82 Am. Dec. 295; Morawetz, Priv. Corp., sec. 1119."

It will be noticed that the court cited Jack v. Williams, *supra,* and Commonwealth v. Fitchburg Ry. Co., *supra,* to sustain its position that a railroad company can abandon a portion of its line only when the entire system would be endangered by requiring it to operate the abandoned part.

Without further elaboration, it is sufficient to say that the cases cited in Iowa v. Old Colony Trust Co., *supra,* sustain the proposition that the question of loss in operating the road must be considered in connection with its duty to the productiveness of its corporate business, as a whole; that the law imposes upon it the duty of furnishing adequate facilities to the public on its entire system, not a part only; and, that it can not be excused from performing its full duty merely because by ceasing to operate a part of its system, the net returns would be increased.

In the note to Kansas v. Dodge City, M. & F. R. Co., 24 L. R. A. 564, written in 1894, the author formulated the rule as follows:

"The right of a railroad company to abandon the exercise of its franchise by ceasing to operate its railroad has been generally denied by the courts when speaking to the subject incidentally, and also in some decisions to that effect.

"In case of insolvency the practical question of how the company can be compelled to operate the road presents serious difficulty. When the railroad company is not insolvent, but finds a certain section or branch of its road unprofitable, the right to abandon that portion for that reason is, so far as actual decisions go, some-

what uncertain. The decisions imply that such an abandonment cannot be allowed."

And, in the note in L. R. A. 1915A 549, written in 1915, the distinction between the right to abandon an entire bankrupt road and the abandonment of a part of a solvent road, is made and the cases classified accordingly.

In giving the result of the more modern cases upon the subject, that note says:

"The general rule seems to be that a railroad cannot abandon its road or a branch, even though it may be operated at a loss, and cases which are apparently in conflict with this rule will be found to have turned on special circumstances that warranted the decision."

The reason for the rule is twofold. In the first place, as a road can be built only with the consent of the state, it must perform the duties incumbent upon it, as constructed; and, since people acquire property and create business enterprises upon the faith of existing railroads, it is the public policy of the state to make those conditions permanent and unchangeable. The powers vested in railroad commissions are instances and extensions of the same public policy.

See Colorado & S. R. Co. v. State R. R. Com., 54 Colo. 64; State v. Dodge City M. & T. R. Co., 53 Kans. 377, 4. Am. St. Rep. 295; Attorney General v. West Wisconsin R. Co., 36 Wis. 466; State v. Sioux City & P. R. Co., 7 Neb. 357; Southern R. Co. v. Franklin & P. R. Co., 96 Va. 693, 44 L. R. A. 297, (distinguishing Sherwood v. Atlantic & D. R. Co., 94 Va. 291); Brownell v. The Old Colony R. Co., 164 Mass. 29, 29 L. R. A. 169, 49 Am. St. Rep. 442.

Furthermore, in Commonwealth v. L. & N. R. R. Co., 120 Ky. 105, this court said:

"It is strongly insisted for appellee that the income that would be derived from operating trains for local passenger and freight traffic on that part of the road where it does not now afford such accommodation, would be insufficient to maintain such accommodation. On this point there is some conflict of evidence, but it was made to appear on the hearing before the Railroad Commissioners that appellee's net income upon its entire system in Kentucky is about $4,000,000.00 per annum, and on the Shelbyville branch from Shelbyville to Anchorage, $31,000.00 per annum. We do not find these facts suc-

cessfully contradicted in the record. But, in any event, appellee can not be permitted to escape the performance of any duty or obligation imposed by its charter or the general laws of the state by transferring its road, or any part thereof, to a lessee, or upon the ground that its own operation thereof will occasion loss to it.''

And, in Brown v. Atlantic Railway Co., *supra,* the Supreme Court of Georgia said:

''If the test of profitableness is to be applied, we are by no means certain that the mere selection of two or three small stations, and proof of the amount of business done at them, disconnected from a general consideration of the line on which they are located, could be taken as conclusively showing the right to omit that part of the line altogether, and relocate or run trains by another line partly owned by the same company and partly used by it under some character of lease.''

It will thus be seen that the cases upon the subject can easily be divided into two distinct classes, presenting entirely different legal principles: (1) those cases in which the company owning the entire railroad has become bankrupt and is without means or credit to reinstate itself; and, (2) those cases in which it is proposed to abandon the unprofitable part of a road belonging to a profitable system.

In the first class, the abandonment is sometimes justified and will be permitted from the very necessities of the case; in the second class of cases it is not justified and will not be permitted, in any case, except at the permission of the state.

The cases relied upon by the appellant belong to the first class, while the case before us clearly comes within the last class.

This conclusion is supported by the language of subsection 4 of section 768 of the Kentucky Statutes, which authorizes a railroad company, for certain purposes, to change the location of any portion of its road, but further provides that it ''shall not, except as otherwise provided, depart from the general route prescribed in the articles of incorporation.'' There is no provision in the statute for the abandonment of a railroad, under any circumstances; and, it needs no argument to show that an abandonment is a ''departure'' from the general route, of the most radical character.

Judgment affirmed.