## SALE OF AN INTERURBAN ROAD FOR JUNK ENJOINED.

Common Pleas Court of Shelby County.

VILLAGE OF FORT LORAMIE v. C. P. GRESS ET AL.*

Decided, January Term, 1918.

*Interurban Road—May Not be Abandoned, When—Owner of the Road Bound by the Terms of the Franchise—Where Owner is Not a Common Carrier, Organization of a Common Carrier Company to Operate the Road May be Required.*

1. Operation of an interurban road, which is being run at a loss, may be abandoned and the road sold as junk so far as the charter granted to the company by the state is concerned; but, a franchise agreement, entered into by the company with a municipality with a fixed period to run which has not yet expired, embodies contract rights which the company may not ignore and a court is without power to set aside.

2. A municipality which is a party to a franchise agreement with an interurban railway which has not yet expired may enjoin the sale of the road for junk and compel its continued operation.

3. Where the present owner of the road is a bank which has acquired the property of the company through ownership of its bonds, a court will require the bank to organize a company with common carrier powers and to commit operation of the road to such company.

*Percy R. Taylor* and *John Oldham,* for plaintiff.

*H. T. Mathers* and *Goeke, Anderson & Boesel,* for defendants, the First National Bank of New Bremen, Ohio, and the Western Ohio Railway Company.

BARNES, J. (orally).

This is an action of injunction, the petition being filed by the village of Fort Loramie against the defendants, C. P. Gress and the Western Ohio Railway Company. Gress, however, is a nominal defendant and we are dealing with the First National Bank of New Bremen, Ohio.

* Affirmed by the Court of Appeals, *Village of Fort Loramie* v. *Gress et al*, 29 O. C. A., ——.

The village of Fort Loramie, in their petition, complains of the defendant that they were intending to cease operation of the railroad known as the Minster & Loramie Railroad. This company was incorporated several years ago and operated a railroad from Minster to Fort Loramie. The First National Bank of New Bremen were bondholders of the railroad, and on two different occasions receivers were appointed for the railroad. The first receivership was adjusted in some way and the road continued its operation, with possibly a refinancing. After a time a receiver was appointed again and the road was sold to C. P. Gress, who represented the First National Bank of New Bremen, the First National Bank being the holder of the bonds and also some notes for money loaned the railroad company. Shortly after the bank purchased this railroad property they signified their intention, as the petition sets forth, that they intended to cease operation of the railroad. The petition sets forth further that they not only intended to cease operation of the road, but they intended to junk the road. The answer of the bank admits that they intended to cease operation, but denies that they intended to junk the road until they received an order so to do from the proper authority. The answer of the bank, in a cross-petition, asks for authority from the court to junk the road. The Western Ohio was also made a party defendant, but at the time of filing the original petition no injunctive order was sought against the Western Ohio, but subsequently a temporary restraining order was sought and granted, restraining the railroad company from ceasing operation under an operating contract originally entered into between the Minster & Loramie Railroad Company and the Western Ohio Railway Company.

It is the contention of the plaintiff in this case that by reason of the charter that was granted to the Minster & Loramie Railroad Company from the state, and also by reason of the franchise that was secured from the village of Fort Loramie, that thereby the railroad must continue to be operated and they have not the right to cease operation or to junk it.

The bank makes several defenses. They contend that, since the road does not pay operating expenses and interest on invest-

ment, they should have the right to cease operation without any order of court. They also claim that if they have not a right to cease operation without an order of court, that a court of equity in this proceeding should grant them the right and give them an order to cease operation. The bank also contends that whatever the rights might be of the village of Fort Loramie against the Minster & Loramie Railroad Company if they are still operating, that those rights would not hold against the First National Bank of New Bremen. They claim that it would not hold against the bank for the reason that the bank is a national bank and therefore would not have the right to operate a railroad, and that any of the contractual relations that might have existed through a franchise or charter, would be *ultra vires* as to the bank. It is also contended that the contract between the Minster & Loramie Railroad Company and the Western Ohio Railway Company is not assignable and that the bank is not a successor or an assignee of the Minster & Loramie Railroad Company as to either contract, and for that reason that an order can not be made to continue the road, or the operation of the road; and, further, that for this and other reasons they should be granted the right to junk the road.

Taking the questions up in what seems to the court to be the logical order in investigating the matter, the first query comes as to what obligations rest on the Minster & Loramie Railroad Company. They procured a charter from the state under the then existing law of the state; they also procured a franchise from the village of Fort Loramie. Now, it is contended on behalf of the plaintiff that, under and by virtue of the charter obligations of the state, the railroad company must continue to operate its road and can not cease to operate unless it is authorized by some competent authority. In support of that proposition, one of the leading cases that is cited is 53 Connecticut, 833 (5 Atlantic Reporter, 695). There were also cited 92 Ohio State, page 1, and another case at page 9, and *Railway* v. *Hatchett*, 192 S. W., 694. These cases, except the Connecticut case, have to deal more particularly with regulations of railroads. There is no question that it is the law of this state that a railroad

company, when it receives charter rights from the state and builds a railroad under and by reason of those charter rights, is subject to the regulations and any existing law of the state that regulates a public service corporation, and this rule is true as to any public service corporation; if it operates it must subject itself to these rules and regulations so long as they are reasonable. If the state by the Legislature or any other body that power is delegated to, imposes unreasonable regulations on a public utility, such regulations as would in a measure confiscate the property of the public utility, a court may relieve the public utility from observing those regulations. In other words, a regulation can not confiscate property. These decisions that were cited by plaintiff attempting to show the obligation of the Loramie Company to operate this road hardly touch this question, except the Connecticut case, because they deal with regulations and this is not a question of regulation. The Connecticut case is based on the peculiar language of the law of that state. That is, they hold that by reason of the charter obligations existing under the law of that state, that a railroad company in that state can not cease operations even though they may be compelled to operate at a loss, and they cite decisions of other states and say that is the weight of authority in other jurisdictions than Connecticut. The contrary rule has been adhered to only in the states where the charter obligations are not such as to make it obligatory on a public service corporation to operate under any and all circumstances.

Now making investigation in Ohio as to what the rule would be here, I find that the Ohio courts have not followed the Connecticut rule, although in some decisions in Ohio they have referred to this Connecticut case. But when the question has been really before them they have not adhered to that rule. So that in Ohio there is probably no charter obligation that would compel the operation of a public utility regardless of whether it can be operated at a profit or not, and unquestionably none where a public utility can not operate except at a loss. The evidence in the case at bar shows that while the road could possibly pay operating expenses, it could pay no more than operating expenses;

it could pay nothing to speak of as interest on the investment; it could not create any contingent fund to keep up repairs that are bound to be required in the future, and it could not be said it would not be a losing venture from an investment standpoint. So that, dealing with this question as to the charter obligations alone, I do not think that the plaintiff would be entitled to an order of injunction.

Now this brings us to the next proposition involved, and that is as to the franchise rights and obligations. The terms "franchise" and "charter" are used sometimes interchangeably; it is sometimes said the rights procured from the state are charter rights and sometimes they are spoken of as franchise rights; but in passing and speaking of these rights, when I speak of charter rights I refer to the rights procured from the state, and franchise rights as those procured from a municipality.

Now the Minster & Loramie Railroad Company procured a franchise from the village of Fort Loramie. The courts have held in this state that a franchise is a contract and that it is binding on all parties to it. The Legislature of this state, in Section 3771 and Section 9102 of the General Code, has enacted a very positive provision, that franchise rights granted by a municipality shall not be altered during the life of the franchise, which means that if the franchise is granted for any period of time the municipality can not, by subsequent legislation, relieve the public utility of the obligations that are imposed in the original ordinance granting the franchise, where that ordinance was accepted by the public utility, for the passage of the ordinance and the acceptance by the public utility constitutes a binding contract between the parties. In the ordinance in question, passed by the village of Fort Loramie, granting a franchise to the Minster & Loramie Railroad Company, the time was stipulated in the ordinance at twenty-five years. Now the question arises as to whether the time was material to the contract or was a material part of the contract. It might be construed as simply a designation of the time for which the public utility might exercise its rights under that ordinance, but in examining the authorities I think the rule is positively laid down in this state that the

time is material, and that where the ordinance granting the franchise stipulates a time, it is a binding obligation upon the public utility where it files its written acception, as was done in this case. The 81 Ohio State, 33 (*East Ohio Gas Company* v. *City of Akron*), is one of the first cases that dealt with this question; the first syllabus reads as follows:

"Where a corporation is formed 'for the purpose of producing, purchasing and acquiring natural gas' and 'of piping and transporting natural gas from the place or places where it is produced, purchased or acquired' to certain named towns and cities situated in the counties along the line of said company and between the termini thereof, 'and to other cities, villages and places in the counties aforesaid,' it is not one of the charter obligations of such corporation to furnish natural gas to consumers in all of such cities, towns and villages."

And in the second syllabus:

"Where a municipal corporation, by ordinance, gives its consent that a natural gas company may enter the municipality, lay down its pipes therein and furnish gas to consumers upon terms and conditions imposed by the ordinance, which are accepted in writing by said company, such action by both parties constitutes a contract, and the rights of the parties thereunder are to be determined by the contract itself."

Now the question involved in that case was whether or not the gas company could cease to furnish gas to inhabitants in the city of Akron. Some ten years previous to the institution of the suit the gas company had commenced operation in the city of Akron under an ordinance that specified the term of ten years. At the expiration of the term of ten years the city council passed a new ordinance prescribing a lesser rate per thousand to be charged the consumers for gas. The gas company immediately gave notice that it would discontinue operations in the city of Akron, and an action was brought to prevent them from ceasing operations, and to compel them to continue to furnish gas and to furnish it at the rate prescribed in the new ordinance. The new ordinance was not accepted by the gas company. Now in

this case, as it was brought and as it was considered by the court, arose the question as to the charter obligations, and the Supreme Court, in deciding the case, while holding that the charter provided for the furnishing of gas to numerous cities, naming them, and Akron was one of them, yet say that it was not a contract, and that it was separable, and the ten-year ordinance having expired there was no contract existing between the gas company and the city, and that by reason thereof the gas company had a right to retire from further operations in the city of Akron. So that a careful reading of the case will disclose that the question of time in the franchise is material matter and that it is a material and binding part of the contract.

Now it is urged that that was a different public utility from the one we are dealing with in the instant case; that the court might adopt a rule of that kind as to a natural gas company but it would not be a proper rule to adopt as to a railroad company. But in the case of *State* v. *Northern Ohio Traction Company,* decided in the 93 ·Ohio State, page 466, the court again deals with this same question and in a case relative to an interurban railway, and follows the decision in the 81 Ohio State. There is not a full opinion; the majority of the court only say, "Judgment for relator on authority of *The East Ohio Gas Company* v. *City of Akron,* 81 Ohio, 33." The judgment is by Nichols, Chief Justice, Johnson, Wanamaker and Matthias. Jones, Donahue and Newman dissent in an opinion written by Judge Jones. In that case the interurban railway company had a charter from the state, of course. They had obtained from the county commissioners through the counties where they operated, possibly one county, a consent or a franchise as it might be called. The term was not stated; no time was designated. The railroad company maintained that it was indefinite. The proceeding was in quo warranto. The prosecuting attorney, representing the state, maintained that, since no time was designated, it was a contract at will and that either party could terminate it whenever they saw fit. The statement of the case discloses that there was no difference or no disagreement or no complaint on the manner or method of operation except on the

question of rates, and the commissioners were insisting upon a rate that the railroad company was unwilling to agree to. It was argued that the question of rate was a matter that should be determined and handled by the public utilities commission and that it was not one of their charter obligations, but was purely a regulation. But the court renders their opinion on the authority of 81 Ohio State, the Akron case, and in effect say that since no time is designated, it is a contract at will. It was also argued, and it is shown in the dissenting opinion, that there wasn't any provision of law suggesting or requiring that county commissioners should grant rights or franchises for any designated period. There was a provision of law, of course, that arrangement must be made with the county commissioners when they cross highways, but no provision that county commissioners may grant rights for any specified time. But notwithstanding that, the court held the majority of the court at least, that no time being specified it was a contract at will. The decision of the circuit court in the same case is reported in 15 C.C.(N.S.), 577, a very full opinion, and the dissenting opinion in the Supreme Court is by Judge Jones and is very full.

If the majority of the courts did not hold otherwise I would be very glad in the present case to follow the circuit court decision and the dissenting opinion, for the reasoning appeals to me. But the Supreme Court, in this very recent case, having decided the matter otherwise, there is nothing that this court can do but follow that decision.

In Ohio thus far we have these two cases, the 81 Ohio State, where the public utility was desiring to withdraw from operation because there was no time stipulated, no franchise, and the case in the 93 Ohio State just referred to, in which the county commissioners, the opposite party, seeks to discontinue operation because there was no time stipulated. This leads us to investigate as to what the courts have held in railroad cases, where a time is stipulated in the franchise. In the case of *State of Ohio, ex rel*, v. *City of Dayton*, 11 C.C.(N.S.), page 263, Judges Sullivan, Wilson and Dustin, a proceeding in quo warranto, the railroad company had been operating in the city of Dayton for

a number of years under a franchise. About the time that this franchise was to expire and negotiations were going on between the city and the railroad company as to a subsequent franchise, a new act of the Legislature was passed authorizing the city to grant franchises for fifty years. The language of the law at that time was that in renewals of franchises the contemplated action be taken before the expiration of the old franchise. In this case the delay was due to the fact that there was a difference between the railroad company and the city, and the ordinance of the council granting the renewal of the franchise was not passed until several months after the expiration of the original franchise. It was contended on the part of the state that the ordinance not being passed in time, that there was no valid ordinance, and they asked to have the railway company ousted. The court held that there was a valid ordinance and it is a valid ordinance for fifty years. And the court held that the ordinance was a contract and that the municipality was bound by it.

Now, in the case at bar, we have just a slightly different situation than in any of the three cases cited. In the case we are now hearing the railway company is seeking to cease operation and the village of Fort Loramie is seeking a mandatory order to compel them to continue operation. I am unable to find any case in Ohio where the question has come to the court in just that way. But reasoning from analogy and from those three cases that have been cited, I can not see how a court could come to any other conclusion than that the same order should be made in a case of this kind that was made in the three cases just referred to. In all three of those cases the court has held the rights of the parties to be controlled by their franchise; if there was no franchise they were not bound by their charter obligations; if the franchise had expired they could not be held; if there was no time mentioned in the franchise it was a contract at will. In this case the franchise says twenty-five years. Now that is a contract. The decisions hold that the contract obligations are binding on the municipality; if they are binding on the municipality they must be binding on the railroad company, because there must be mutuality in order to constitute a binding

contract; you can not bind one side and not bind the other; any provision of a contract that attempts to bind one side and not the other is not a part of the contract. So that, under that situation, the Minster & Loramie Railroad Company would be bound regardless of the question of whether or not it could operate at a profit, because having contracted so to do it must carry out its contract, and the court can not relieve it from an undesirable contract. It did not have to enter into it; it possibly entered into it with the idea that it would be profitable; but now that it proves unprofitable the court is powerless to grant any relief.

We thus far have been dealing with this question as though there had been no sale of this property to the bank. I might say further that counsel for the bank concedes that if there had not been a sale of this property to the bank, that it would be bound by this contract or franchise; that is, that the Minster & Loramie Railroad Company would be bound as provided in the ordinance. But it is contended that the bank is not a successor or an assignee of the railway company. It is also contended that the court can not order the bank to operate; because of it being chartered as a national bank it can not be ordered to operate a railroad company. Counsel upon both sides agree upon the proposition that the bank had the right to purchase the property since it was the owner of the bonds and that it was necessary to do so in order to protect its financial interests in the property; but the bank contends that since it has purchased the property and not being empowered to operate a railroad, that it must dispose of it to some one that can operate it, or junk it and get out of the railroad business. In his brief counsel for the bank cites numerous authorities that personal contracts are not assignable, and attempts to make the cases applicable to this situation. There is no question on the proposition that purely personal contracts are not assignable, but the very cases that are cited by counsel for the bank do say that contracts that are a lien or that run with the land are assignable. Now what is the situation here? This railroad company could not build a railroad at all except through its franchise right; it might have constructed a railroad

outside of the village of Fort Loramie without any franchise right except such as would be procured from the county commissioners, and the county commissioners could have granted rights outside of the village of Fort Loramie in crossing public highways without designating any time, and thereby the contract would have been a contract at will. But that is not what was done. The railroad company procured the franchise from the village of Fort Loramie, and under section ten of that franchise it is provided, among other things, that they shall run cars and connect at Minster with the cars running over the Western Ohio Railway.

Now it is contended that the village of Fort Loramie had no authority to legislate beyond the limits of the municipality, and that anything that is in this ordinance that provides for regulation outside of the municipality would be null and void. This question I think has been decided by the Supreme Court in the case of *Interurban Railway & Terminal Company* v. *Cincinnati*. In that case the franchise was granted by the village of Pleasant Ridge, a village close to Cincinnati. It contains this provision: "Should the village of Pleasant Ridge be annexed to the city of Cincinnati, the rate of fare charged for a ride in either direction between any points in said village and the Cincinnati terminal shall not exceed five cents." Now this was a legislative act by the village of Pleasant Ridge providing for fare and a regulation beyond the limits of the village. It was argued in this case that the village had no authority to legislate beyond its limits and that that provision, while in the ordinance and while it was accepted by the railroad company, had no binding effect because the village had no authority to so enact. The court goes into that question in the dictum very fully and says that the railroad company had, however, a right to regulate and make provisions beyond the limits. And the court gives special attention to the fact that very frequently small villages have absolutely no use or no necessity for a railroad; that they only procure the right to go through them because they are in the line of the interurban railway; and that under the existing law they can not go through them without securing a franchise, and that the village, in grant-

ing the franchise, has the right to make stipulations and provisions that extend beyond the line of the railroad. So applying that principle and that reasoning to the case at bar, I take it that it is a matter of common knowledge at least to all of us here that the village of Fort Loramie had no use for a railway in the village itself, merely to operate in the village, if it did not connect at any other point.

Now if the Minster & Loramie Railroad Company desire to run their cars and operate in the village, they must procure a franchise; and they did procure the franchise in this case and in the franchise it was provided that they run cars to connect at Minster with cars run by the Western Ohio Railway Company. So that I think, from analogy, the court must find that this is a binding obligation in that franchise.

Now touching the other question, how can that bind the bank? Well, we have this situation. This franchise right was necessary before the railroad could build at all. It therefore certainly runs with the land; it is an obligation running with the land; it is a part of the property. They could not have constructed a railroad as they did and where they did except they had procured this franchise; not necessarily the franchise as it is worded, but some franchise. And since they accepted the franchise that was passed and obligated themselves for twenty-five years, they are bound by it. Now anybody dealing with a railroad company must necessarily know when it occupies a village street that it only does so by authority of its franchise; it can not occupy it otherwise; and every one then is chargeable with notice of the provisions of that franchise; they have the right and they have the opportunity to inquire and know just what those franchise provisions were, and if they loan money to, or buy the bonds of the railroad, they necessarily are secured only by the property that is owned by the railroad company; and the railroad company owns its property subject to this franchise, subject to this contract. So that when the bank bought the bonds of the railroad company they took no greater title than the railroad company had, and when a receiver was appointed and sold the property, he could sell nothing more than the railroad company

could sell as an individual, just the same as where as execution is issued. If this property had been sold on execution, there could only have been sold the property the Minster & Loramie Railroad Company owned, and they owned this property subject to the franchise contract. Now it is said that because they are a bank that the obligations would not attach to them. That certainly can not be true, because it certainly can not be argued that the village of Fort Loramie would be deprived of their rights under this contract, simply because some one purchased the railroad who was not authorized to operate it. The village of Fort Loramie was not a party to that suit; none of their rights are passed on by virtue of that suit; they have all the rights under their contract now that they ever had. And just as the bank could buy the property for the purpose of protecting themselves, it must be considered that they bought it charged with all the obligations existing by virtue of this franchise contract. And the obligations of that franchise contract were to continue in operation for twenty-five years. So that when they purchased the property to protect themselves they could not cease to operate simply because they are a National Bank. Furthermore, a National Bank could not take advantage of the doctrine of *ultra vires* for their own benefit. Generally speaking, that question is raised by the government, or it may be raised by some stockholders against the officers of the bank creating the liabilities, but a bank can not relieve itself of undesirable obligations by simply setting up the question of *ultra vires*.

Now there is another question that is not raised in the briefs, but suggests itself to the court, viz., the bank is not a common carrier. It has not the right of eminent domain; that would be true of an individual, but simply because it is not a common carrier, it has not the right of eminent domain. The bank might be proceeded against in quo warranto, because it has not the right to operate.

A question occurred to the court as to whether or not this was a proper proceeding, due to the fact that this road was being operated by some one who had not the rights of a common carrier. But I find that question has been decided in *State* v. *To-*

*ledo Railway Company,* 3 C.C.(N.S.), page 285, where the court held that the case made was *ex contractu* or quo warranto. The state may bring the action in quo warranto, but the parties to the contract may bring the action *ex contractu.*

Now, relative to the application that is made by the railway company to junk, I think what the court has already said possibly answers that proposition. I do not think that the court, in any case, would have the right to issue an order and grant the right to cease operation unless there was some legislative authority for it. In cases where mere charter rights are involved, or mere regulations, reasonableness or unreasonableness of them— in no case that I have been able to find has the court ever granted an order to cease operation. The court may have granted an injunction against the order that was made because it was unreasonable and might confiscate the property. If the utility cease operation courts have been called upon to compel them to operate; and, where there is no franchise agreement for a definite period, courts have refused to give a mandatory order to compel operation; but I know of no case where a court has granted the right to cease operation. If there is no franchise contract requiring operation, then the utility can quit of its own volition; it does not require any court order so to do. Of course, the recent enactment of the Legislature in the 107, page 525, I believe it is, which requires application to be made to the utilities commission before a utility can cease operation would not apply, but even that would not be an application to the court, but an application to the public utilities commission. So that regardless of any other question that is involved in this case the court does not think, under any circumstances, it would have any authority to grant to any public utility the right to cease operation; if they have the right they have the right without an order of court.

A question also arose by reason of the contract—operating contract as we may term it—between the Minster & Loramie Railway Company and the Western Ohio Railway Company. There are no other parties to this contract than these two corporations. Under that operating contract I think there is no

question that the Minster & Loramie Railway Company are the operators, and not the Western Ohio. The contract was not entered into for the benefit of the village of Fort Loramie and, consequently, it can not be said in law that they have any interest in the contract. By reason of that fact the court has no power to make any order in this proceeding against the Western Ohio Railway Company, and the temporary restraining order I have granted will be dissolved so far as the Western Ohio Railway Company is concerned. If this was a question wholly between the present owner of the Minster & Loramie Railroad Company and the Western Ohio Railway Company, the court is inclined to think, if that question was before it, that it would find that all the rights of the Minster & Loramie Railroad Company do now inure, or did at the time of the receiver's sale, to the present owner of the Minster & Loramie Railroad Company.

It is disclosed in the evidence that this contract is the means at present of operating the road; that the Minster & Loramie Railroad Company, or its present owner, has no means of operating the road at the present time except by its operating contract with the Western Ohio Railway Company; that if this contract between the Western Ohio and the Minster & Loramie Railroad Company were set aside, or by agreement between them it should be discontinued, the railroad could not be operated. Consequently, the court will order that the present owners of the Minster & Loramie Railroad Company do nothing to abrogate or set aside that contract, but that they do everything to keep it in full force and effect until they are prepared to find some other means of operating the road.

A question has come to the court's mind as to the means of enforcing an order of this kind, since the present owner of the railroad is not a common carrier. In the case of *State of Ohio* v. *Toledo Railway Company*, 3 C.C.(N.S.), 285, the court, on the last page of the decision, says that the court may mold the remedy to meet the exigencies of the case. And also I find in the 47 Federal, page 15, where Judge Brewer of the district court lays down the rule that a court of equity has almost any power to enforce and carry out its orders.

So, under the situation, the bank not being a common carrier, therefore not authorized or having the rights of eminent domain, and by reason thereof subject to a quo warranto proceeding, it will be the order of the court that the bank proceed to organize a company that will have the right of eminent domain so as to carry out all the provisions of this franchise contract; and on failure so to do the court will appoint a receiver to operate the road and to place it in the hands of a company having the right of eminent domain. Now the court does not want to put the company to the expense of a receiver, if this order can be carried out by the parties of their own volition; or if the parties desire to take this to the higher court, which I apprehend they will, I do not want to put them to any unnecessary trouble or expense, if some arrangements can be made pending the hearing in the higher court to preserve the rights of the parties.

The temporary injunction will be made perpetual as against the present owners of the Minster & Loramie Railroad Company, and the costs will be ajudged against the defendant. Appeal bond, $200. The answer and cross-petition of the bank will be dismissed.